FILED

AUG 18 2011

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

1  Rey Olsen
2  Appearing *in Propria Persona*
3  *Montenegrex*
4  *P. O. Box 7022*
5  *New York, NY 10150-7022*
6  *(917) 701-1101*
7  *WSGNY@AOL.COM*
8
9               UNITED STATES BANKRUPTCY COURT
10               CENTRAL DISTRICT OF CALIFORNIA
11                    SANTA ANA DIVISION
12
13
14  In re:                         Case No. 8:11-bk-19915-TA
15
16
17  COBALIS CORPORATION,
18           Debtor.               Chapter 11
19  _____
20                                 Points and Authorities in support
21                                 of Montenegrex application to modify
22                                 automatic stay, FRBP 4001(a)(2),  and for
23                                 other and further relief.
24
25                                 Date:        August 22, 2011
26                                 Time:        10:00 AM
27                                 Ctrm:        5B
28                                              411 West Fourth Street
29                                              Santa Ana, CA
30                                 Judge:       HON. THEODOR C. ALBERT
31

# TABLE OF CONTENTS

Page No.

Table of Authorities                                                                                      viii

I.      Questions Presented.                                                                           2

II.     General overview.                                                                                3

III.    Point-by-point overview.                                                                    3

(a)     Montenegrex should be granted leave from the automatic stay,
under 11 U. S. C. § 362(d)(2)(A) to enter into a consensual agreement
with Cobalis to accept title to all of its assets as partial satisfaction of
Montenegrex claim.                                                                                   3

1.      Gryphon was granted permitted lien status by YAGI and Cobalis.         3

2.      YAGI's UCC-1 filing also protects the permitted lien of
Gryphon/Montenegrex.                                                                            4

3.      Montenegrex proposed satisfaction of its priority lien will benefit all
parties-in-interest.                                                                                  4

4.      The requirements of 11 U. S. C. § 362(d)(2)(A) and (B) are satisfied.    5

(b)     The real value of YAGI's disputed claim is zero due to the usury
provision of California's Constitution.                                                    6

1.      Bereft of any statutory exemption, YAGI violated
Article XV, § I of the California Constitution that limits interest rates
to 10% per annum.                                                                                  6

2.      Cobalis, because of the said usury, has offsetting counterclaims
against YAGI, namely treble damages.                                                    7

3.      Cobalis is entitled to its attorney's fees incurred in opposition
to YAGI's claims.                                                                                    7

4.      Cobalis is also entitled to apply for punitive damages.                     8

(c)     Cobalis should be excused from performing its contract with YAGI
based on its breach of a material provision of its contract and by breaching
New Jersey's covenant of good faith and fair dealing that is implied in
every contract subject to the laws of New Jersey.                                          9

(d)     Both Chapter 11 cases of Cobalis should be dismissed.                               9

1.     Cobalis can continue its presently profitable operations,
without interruption, in the best interest of all parties-in-interest.                      9

2.     Both Chapter 11 cases should be dismissed, not converted to Chapter 7.               9

(e)     YAGI violated the automatic stay in the 2007 bankruptcy case to the
detriment of _all_ parties-in-interest.                                                     9

IV.     Statutory authority.                                                               10

V.      Relevant Facts.                                                                    11

VI.     ARGUMENT                                                                           13

(a)     It was the clear intent of YAGI and Cobalis that Gryphon's lien on all
of the assets of Cobalis take seniority over any lien of YAGI.                             13

1.     Gryphon forebeared from registering in Nevada and California its Texas
judgment against Cobalis based upon the promise of Cobalis that Gryphon's
judgment would be disclosed in the SA, as it came to be, as a permitted lien.              13

2.     The doctrine of promissory estoppel is recognized and enforced in
California and New Jersey.                                                                  15

3.     The doctrine of _equitable subrogation_, is recognized under New Jersey
and California law; the latter holds that subrogation is unaffected by the
UCC-1 filing of YAGI.                                                                      16

4.     Under New Jersey substantive law, if YAGI were to obtain assets of
Cobalis and not turn them over to Montenegrex, it would be unlawful.                       17

5.     The SA as between YAGI and Cobalis clearly provides that Gryphon,
as the holder of a lien arising from a judgment, has a security interest in the

1    assets of Cobalis; this security interest, described as a permitted lien, takes
2    precedence over any security interest of YAGI in the same assets.                18
3
4    6.  The term "permitted lien" has a clear, commonplace meaning as it is
5    extensively used by courts to describe an interest in an asset being conveyed
6    that is subject to an encumbrance.                                                19
7
8    7.      The Confirmed Plan retained the liens of YAGI, as set forth
9    in the SA.                                                                        20
10
11   8.      The SA, in allowing for Montenegrex permitted lien, is in effect
12   a subordination agreement in favor of Montenegrex.                                20
13
14   9.      Even without the SA, YAGI was aware of Gryphon's judgment.        21
15   10.     YAGI's affirmative knowledge of and consent to the permitted
16   lien requires that YAGI act in the best interest of Montenegrex.                  22
17
18   11.     Montenegrex has standing, as the successor of Gryphon to demand
19   that Gryphon's permitted lien be paid ahead of any other payment from
20   Cobalis to YAGI.                                                                  23
21
22   12.     The change of priorities agreed to by YAGI in its agreement with
23   Cobalis inures to the benefit of Montenegrex but does not affect the rights of
24   other creditors.                                                                  24
25
26   13.     Montenegrex is entitled to increase its claim for the post-judgment
27   interest that stopped running when YAGI filed its Petition against Cobalis
28   on August 1, 2007.                                                                24
29
30   14.     There is no issue of lien avoidance by the trustee, the
31   debtor in possession, which otherwise should find the offer of Montenegrex
32   highly favorable.                                                                 25
33
34   15.     As the amount of Montenegrex permitted lien exceeds this Court's
35   valuation of all of the assets of Cobalis,  and as Cobalis agrees that all of
36   its assets should be turned over to Montenegrex in partial satisfaction of its
37   judgment and post-judgment interest against Cobalis, this Court should
38   order same.  Montenegrex  will then lease these assets back to Cobalis
39   so that its business of selling Pre-Histin® can continue.                         25
40

16.    Since this Court determined that the value of Cobalis assets, largely
patents and trademarks, lose value at the rate of 20% per year, Montenegrex
must also receive from the escrow account the sum of $361,555.                         26

17.    Even if viewed as a sale of assets under 11 U. S. C. § 363(f), all
requirements are met.                                                                  27

(b)    The transaction documents between YAGI and Cobalis are usurious
since the rate of interest is over 15% and while the underlying loan is
commercial and over $300,000 thus facially appearing to benefit from an
exemption, YAGI required that individuals personally guarantee its loan to
Cobalis thereby vitiating the statutory exemption to the usury clause of the
California *Constitution*.                                                              28

1. The Bankruptcy Code gives Montenegrex standing to object to YAGI's claim. 28

2.    The exemption to California's constitutional 10% interest rate limitation
on commercial loans in excess of $300,000 is lost if the lender requires
a *personal guarantee*.                                                                28

3.    Cobalis is entitled to statutory treble damages for the interest paid to
YAGI.                                                                                  29

4.    The contract for the repayment of the principal amount nominally
owing to YAGI is void and unenforceable under the California *Constitution*.           30

5.    YAGI's claim is grounded in an illegal contract under California law and
thus it is unenforceable under 11 U. S. C. § 502(b)(1).                                30

6.    Cobalis is also entitled to punitive damages.                                    32

7.    The fact that the SA and SPA were subject to New Jersey law is
unavailing to YAGI.                                                                    36

8.    Under New Jersey law, both a fee-shifting agreement and an indemnity
agreement requires that the claimant be the *prevailing party*, which YAGI would
not be if its claim is denied or substantially reduced.                               38

9. An indemnity agreement, under New Jersey law, only permits YAGI to seek
recovery of any liability that YAGI incurred to a *third party* by reason of

1    Cobalis fault, missing predicate circumstance.    38

3    10.    Cobalis, as the prevailing party successfully opposing YAGI's claim, is
4    entitled to recover its attorney's fees from YAGI.    39

6    (c)    YAGI's repeated shorting of Cobalis shares while the debentures
7    purchased by YAGI were still outstanding is a material breach of the SPA
8    and excuses all performance by Cobalis.    40

10    1.    It is beyond cavil that YAGI shorted Cobalis shares beginning in 2007
11    pre-petition and continuing thereafter.    40

13    2.    The shorting of Cobalis shares by YAGI was explicitly prohibited
14    in the SPA.    40

16    3.    This Court may not, as it has done, rewrite § 4(l) to make it more
17    favorable for YAGI.    41

19    4.    It is only when a party successfully argues *ambiguity* that a Court
20    may look beyond the plain meaning of contractual terms.    42

22    5.    This Court has never found ambiguity in § 4(l) of the SPA.    43

24    6.    Under the unambiguous terms of § 4(l) this Court is constrained to
25    determine  that based upon its prior findings that YAGI engaged in
26    short selling of Cobalis shares from April 2007 onwards that YAGI violated
27    the parties agreement so as to excuse performance by Cobalis.    45

29    7.    There is nothing to prevent parties from adding provisions to an
30    agreement that are more stringent than statutory protections.    45

32    8.    Because the shorting by YAGI contributed to the driving down of the
33    price of Cobalis stock from $1.25 in May 2007 to $0.01 in December 2007,
34    Cobalis was denied its "reasonable expectations" and the enjoyment of the
35    "fruits of its contract" with YAGI.  Under binding New Jersey law, this is
36    sufficient to excuse Cobalis  performance.    46

9.    Montenegrex should not be bound by the law of the case doctrine.    49

10.    The extensive shorting of Cobalis shares by YAGI when the convertible
debentures were outstanding, violates § 4(l) and requires that Cobalis be excused
from all repayment to YAGI, under binding New Jersey law.    50

(d)    YAGI violated the automatic stay when it converted debt into shares of
Cobalis stock that were the Debtor's property, without leave of the Court.    53

1.    There is no issue that YAGI converted debentures after filing its
Chapter 7 Petition on August 1, 2007.    53

2. If the shares were property of the *Debtor's estate*, they were subject
to the automatic stay.    54

3. If the shares were property of the *Debtor*, they were subject to the
automatic stay.    54

(e)    Cobalis and all of its remaining creditors would be best served by a
dismissal of the cases.    55

V.    Conclusion    56

1

2                                 **Table of Exhibits**

3                    **(Annexed to accompanying declaration of Rey Olsen)**

4

5    Exhibit "1"    Securities Purchase Agreement

6    Exhibit "2"    Security Agreement Exhibit

7    Exhibit "3"    Gryphon Judgment

8    Exhibit "4"    Documents filed with the SEC by Cobalis

9    Exhibit "5"    Analysis of comparable marketing capitalizations by David E. Reese, Ph. D.

10   Exhibit "6"    Pledge Agreement

11

12

13

14

15

16

17

18

# TABLE OF AUTHORITIES.

| # | Statutes, regulations and rules | Page |
|---|---|---|
| 1 | | |
| 2 | **Statutes, regulations and rules** | **Page** |
| 3 | 11 U. S. C. §157(b)(1) | 10 |
| 4 | 11 U. S. C. §157(b)(2) | 11 |
| 5 | 11 U. S. C § 362 | 10 |
| 6 | 11 U. S. C. § 362(a)(5) | 54 |
| 7 | 11 U. S. C. § 362(d)(2)(A) | 3, 5 |
| 8 | 11 U. S. C. § 362(d)(2)(B) | 6 |
| 9 | 11 U. S. C. § 362(d)(2)(A)(B) | 11, 56 |
| 10 | 11 U. S. C. § 362(a)(3)(5)(6) | 10 |
| 11 | 11 U. S. C. § 363(f) | 17 |
| 12 | 11 U. S. C. § 502(a) | 3 |
| 13 | 11 U. S. C. § 502(b)(1) | 7, 11, 30, 31 |
| 14 | 11 U. S. C. § 510 | 11 |
| 15 | 28 U.S.C § 1334 | 10 |
| 16 | 28 U.S.C. § 1963 | 14 |
| 17 | *Fed. R. Bankr.P.* Rule 4001(a)(2) | 11 |
| 18 | *FRCP* 62(a) | 14 |
| 19 | *California Constitution,* Article XV, § 1 (2) | 2, 6, 28 |
| 20 | *California Civil Code* § 1667 | 31 |
| 21 | *California Civil Code* § 1717(a) | 7, 39 |
| 22 | *California Corporation Code* § 25118 (b)(1) | 11, 28, 29 |
| 23 | *NRS* 104.1202 | 14 |

1    *N.J.S.A.* 2C:20-9                                          17

2    *N.J.S.A.* 46:22-1                                         18

3    **Case Law**

4    *Bank of the West v. Superior Court*
5    2 Cal.4th 1254, 1264 (1992)                                14
6

7    *Barr v. Barr*
8    418 N.J.Super. 18, 32, (N.J.Super.A.D. (2011))             43
9

10   *BASF Corp. v. Lyondell Chemical Co.*
11   L 5288645, 5 -6 (N.J.Super.A.D. (2010))                    42
12

13   *Bratcher v. Buckner*
14   90 Cal.App.4th 1177, 1186 (Cal.App. 4 Dist. (2001))        21
15

16   *Bruning v. United States*
17   376 U.S. 358 (1964)
18

19   *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping*
20   *Center Associates* 182 N.J. 210, 226, (N.J. (2005))       47
21

22   *Bak-A-Lum Corp. of America v. Alcoa Bldg. Products, Inc.*
23   69 N.J. 123, 129-130 (N.J. (1976))                        47, 48
24

25   *Columbia Southern Chemical Corporation V. Manufacturers*
26   *And Wholesalers Indemnity Exchange* 190
27   205 Cal.App.2d 194 (1961))                                 21
28

29   *Consolidated Plan of New Jersey, Inc. v. Shanholtz*
30   7 N.J.Misc 876, 147A 401                                   30
31

32   *Consolidated Plan of New Jersey v. Palkowitz*
33   107 N.J.L. 517, 153 A. 906                                 30
34

1  *Crevier v. Sullinger* 57 Fed.Appx.
2  319, 321, 2003 WL 249349, 1 (9th Cir. (Cal.) (2003))                    34
3

4  *De Tarquino v. City of Jersey City*
5  352 N.J.Super. 450, 455-456 (N.J.Super.A.D. (2002))                    46
6

7  *Deutsch v. Binet*
8  2011 WL 2320899, 8 (N.J.Super.A.D. (2011))                             50
9

10  *Development Acquisition Group, LLC v. eaConsulting, Inc*
11  2011 WL 837162, 4 (E.D.Cal. (2011))                                   29
12

13  *Fireman's Fund Ins. Co. v. Maryland Casualty Co.*
14  65 Cal.App.4th 1279, 1291 (1998)                                      17
15

16  *Friedman Siegelbaum, LLP v. Pribish*
17  2009 WL 910326, 9  (N.J.Super.A.D. (2009)                             48
18

19  *Gilbert v. Wisdom*
20  2007 WL 2084336, 9  (Cal.App. 4 Dist. (2007))                         30
21

22  *Gonzalez v. Arizona,*
23  624 F.3d 1162, 1186-1187 (9th Cir. (2010))                            50
24

25  *Graziano v. Grant*
26  326 N.J.Super 328, 342 (N.J.Super.A.D. (1999))                       43, 44
27
28
29  *Initiative Partners v. California Dept. of Health Services*
30  2006 WL 2423550, 11 (Cal.App. 2 Dist. (2006))                         23
31
32  *Investors Sav. Bank v. Waldo Jersey City, LLC*
33  418 N.J.Super. 149, 159, 12 A.3d 264, 270 – 271
34  (N.J.Super.A.D. (2011))                                               39
35
36  *In re 944 Media, LLC*
37  2010 WL 4520059, 3 (Bkrtcy.C.D.Cal. (2010))                           20
38  *In re 3036 Richmond, Inc.*

x

2001 WL 36275467, 6 (Bkrtcy.E.D.Pa. (2001))                    54

*In re Ayre*
360 B.R. 880, 887 (C.D.Ill. (2007))                            49

*In re Branch*
2009 WL 2046510, 2 (Bkrtcy.E.D.Tex. (2009)                     32

*In re Burns*
887 F.2d 1541, 1543 (11th Cir.1989)                            24

*In re Cline,*
100 B.R. 660, 662–63 (Bankr.W.D.N.Y.1989)                      24

*In re Cytodyn of New Mexico, Inc.*
374 B.R. 733, 738(Bkrtcy.C.D.Cal. (2007))                      55, 56

*In re Desmond*
331 B.R. 38, 41  (Bkrtcy.D.N.H. (2005)                         32

*In re Feinberg*
442 B.R. 215, 225 (Bkrtcy.S.D.N.Y. (2010))                     35

*In re G.I. Industries, Inc.*
204 F.3d 1276, 1280 (9th Cir. (Cal.) (2000))                   28

*In re Gindi*
2010 WL 1253158, 5 (10th Cir.BAP 2010)                         54

*In re Guillory*
285 B.R. 307, 316 (Bkrtcy.C.D.Cal. (2002))                     34

*In re Hanna)*
872 F.2d 829, 830–31 (8th Cir. (1989)                          24

*In re Jones*
72 B.R. 25, 26 (Bkrtcy.C.D.Cal. (1987))                        30

1   *In re Lazy Days' R.V. Center, Inc.*
2   2009 WL 7226969, 2 (Bkrtcy.D.Del. (2009))                    20
3
4   *In re Levitt & Sons, LLC*
5   384 B.R. 630, 648 (Bkrtcy.S.D.Fla.(2008)                     27
6
7   *In re McDonell*
8   204 B.R. 976, 979 (9th Cir.BAP (Cal.) 1996)                  14
9
10  *In re Mitchell,*
11  93 B.R. 615, 617–18 (Bankr.W.D.Tenn.1988)                    24
12
13  *In re Moore*
14  307 B.R. 394, 398 (Bkrtcy.S.D.N.Y. (2004))                   25
15
16  *In re Smith*
17  77 B.R. 624 (Bkrtcy.N.D.Ohio (1987)                          26
18
19  *In re Southern California Plastics, Inc.*
20  165 F.3d 1243, 1247 (9th Cir. (1999))                        30
21
22  *In re Swartz*
23  37 B.R. 776, 777 -778 (Bkrtcy.R.I. (1984))                   31
24
25  *In re TCI 2 Holdings, LLC*
26  428 B.R. 117, 140 (Bkrtcy.D.N.J. (2010))                     20
27
28  *In re Theokary*
29  444 B.R. 306, 320 (Bkrtcy.E.D.Pa. (2011))                    22
30
31  *In re Vanden Bossche*
32  125 B.R. 571, 574 (N.D.Cal. 1991)                            14
33
34  *In re Wyse*
35  340 F.2d 719 (6th Cir. (1965))                               24
36
37  *In re Young*

313 B.R. 555, 559 (Bkrtcy.W.D.N.Y. (2004))    32

*Kaplan v. Walker*
164 N.J.Super. 130,135-36 (1978)    16

*Klussman v. Cross Country Bank*
134 Cal.App.4th 1283, 1291-1292 (Cal.App. 1 Dist. (2005))    37

*Lange v. TIG Ins. Co.*
68 Cal.App.4th 1179, 1185 (Cal.App. 2 Dist. 1998)    15

*Lawrence v. City of San Bernardino*
2005 WL 5950105, 13 (C.D.Cal. (2005))    33

*Leake v. Bergen*
27 N.J. Eq. 360, 1876 WL 8360 N.J.Ch. 1876    36

*Lewis v. Barak Enterprises, Inc*
2011 WL 1549778, 11 (Cal.App. 2 Dist. (2011))    21

*Maffucci v. Royal Park Ltd. Partnership*
243 Conn. 552, 565-566 (1998)    44, 46

*Marshall v. Klebanov*
188 N.J. 23, 37(N.J. (2006))    45

*Matter of Moses*
9 B.R. 370, 374 (Bkrtcy.Ga. (1981))    32

*McBride v. Minstar, Inc.*
283 N.J.Super. 471, 499 (N.J.Super.L. (1994))    23

*Mechanical Contractors Assn. v. Greater Bay Area Assn.*
66 Cal.App.4th 672, (1998))    30

*Mencor Enterprises, Inc. v. Hets Equities Corp.*
190 Cal.App.3d 432, (Cal.App. 4 Dist. (1987))    36

*Mock v. Michigan Millers Mutual Ins. Co.*
4 Cal.App.4th 306, 328 (1992)    33

*Montefusco Excavating & Contracting Co. v. Middlesex County,*
82 N.J. 519, 523 (1980)                                           16

*PNC Bank v. Axelsson*
373 N.J.Super. 186, 195 (N.J.Super.Ch. (2004))                    21, 22

*REF & Associates v. Texaco Refining and Marketing, Inc.*
1991 WL 126406, 1 ((9th Cir. (Cal.) (1991))                     37

*Richmond v. Conservative Credit System*
110 N.J.L. 73, 164 A. 563                                         30

*Royal Associates v. Concannon*
200 N.J.Super. 84, 91 (N.J.Super.A.D.1985)                        15

*Smith v. Hudson County Register*
2011 WL 1529730, 3  (N.J.Super.A.D. (2011))                       38

*Smith v. U.S. Bank Nat. Ass'n*
2010 WL 3659620, 6 (Cal.App. 2 Dist. (2010))                      42

*State Bar of California v. Statile*
168 Cal.App.4th 650, 662 (2008)                                   16

*State v. Pessolano*
343 N.J.Super. 464, 778 A.2d 1153 (A.D.2001)                      17

*Sons of Thunder, Inc. v. Borden, Inc.*
148 N.J. 396, 425, 690 A.2d 575, 589 (N.J. (1997))               47

*Swiss Property Management Co., Inc. v. Southern California*
*IBEW-NECA Pension Plan*
60 Cal.App.4th 839, 843, (Cal.App. 4 Dist. (1997))               21

*Thrifty Oil Co. v. Bank of America Nat. Trust and Savings Ass'n*
310 F.3d 1188, 1200 (9th Cir. (Cal.) (2002))                   31

*Tobar Const. Co. v. R.C.P. Associates*

293 N.J.Super. 409, 412-413 (N.J.Super.A.D.1996)                18

*Transgo, Inc. v. Ajac Transmission Parts Corp.*
768 F.2d 1001, 1025 (9th Cir. (1985))                          34

*Union Montclair Housing Associates v. Township of Montclair*
2011 WL 1225851, 1 (N.J.Super.A.D. (2011))                      43

*Walter v. Hughes Communications, Inc.*
682 F.Supp.2d 1031, 1041 (N.D.Cal. (2010))                      34

**Treatises**

2 *Collier on Bankruptcy,* ¶ 363.07                              27

# I.    Questions Presented

(a)    Can Montenegrex foreclose its "Permitted Lien" of a security interest in all of the pre-petition assets of the Debtor Cobalis Corp. (Cobalis) because it has priority over any lien of YAGI based upon the terms of a Security Agreement (SA) executed by Cobalis and YAGI to which Gryphon Master Fund L. P. (Gryphon), the predecessor-in-interest of Montenegrex, was a third party beneficiary.  Should all assets of Cobalis, as valued by this Court, be turned over to Montenegrex in partial satisfaction of its said permitted lien, and an additional payment in cash from the escrow account as is required to pay Montenegrex entire claim before any other creditor, including YAGI, is paid anything?

(b)    Is the claim of YAGI completely unenforceable because of:

1.    Its charging of interest at 16% per annum in patent violation of California's *Constitution*, Article XV, § 1, limiting interest rates on loans to 10% excepting certain exemptions none of which apply to the circumstances of the loan from YAGI to Cobalis?

2.    Material breaches of the transaction documents, specifically: (i) a clause adding *blanket protection* against shorting above and beyond any governmental restrictions; (ii) the breach of the covenant of good faith and fair dealing that when established by a light burden of proof, requires excusal of performance by Cobalis under New Jersey law that constrains the decision of this Court?

3.    Automatic stay violations by YAGI of such a magnitude that the cost to YAGI of restoring Cobalis to the *status quo ante* is so large as to dwarf any possible claim by YAGI as against Cobalis?

2

## II.    General overview.

The Court has previously announced its intention at a hearing scheduled for August 22, 2011 to decide whether to convert both of Debtor's pending Chapter 11 cases to Chapter 7 or to dismiss one or both of the cases.  Further the Court said it would disburse $1,550,000 in an escrow account under its control that was established to protect the secured and crammed-down unsecured claim of YAGI.     Montenegrex asserts first dibs on the money.

By agreement of YAGI and the Debtor, a prior "Permitted Lien" against all of the assets of Cobalis, Montenegrex argues that no disbursement should be made to YAGI, or any other creditor, until Montenegrex claim is paid in full.   Montenegrex therefore seeks leave to foreclose its lien against all of the pre-petition assets of the Debtor, as valued by this Court, in partial satisfaction of its claim and to seek an order that the remainder of its permitted lien be paid, on a priority basis, from the said escrow account.

Montenegrex alternatively asserts that, under 11 U. S. C. § 502(a), it may object to YAGI's entire proof-of-claim because of: (i) YAGI's violation of California's usury statutes that voids its entire claim; (ii) its multiple breaches of transaction documents governed by New Jersey law that requires excusal of performance by one party to a contract when the other party commits a material breach; and, (iii) YAGI's multiple violations of the automatic stay requiring redress costing a multiple of YAGI's claim; that YAGI may take nothing of Cobalis.

## III. Point-by-point overview.

**(a)    Montenegrex should be granted leave from the automatic stay, under 11 U. S. C. § 362(d)(2)(A) to enter into a consensual agreement with Cobalis to accept title to all of its assets as partial satisfaction of Montenegrex claim.**

**1.    Gryphon was granted permitted lien status by YAGI and Cobalis.**

Regardless of the validity of YAGI's claim, Montenegrex permitted lien has priority over YAGI's claim by the prior agreement of YAGI and Cobalis. YAGI gave Gryphon  priority status as to a security interest in all of the assets of  Cobalis as set forth in the Security Agreement (SA) between YAGI and Cobalis.

1       When executing the SA in December 2006, both YAGI and Cobalis believed that the

2    valuation of Cobalis assets was at least 50 times the $1.6 million of, Gryphon's judgment amount

3    entered in April 2006, thus allowing sufficient collateral for the payment of YAGI's lien after the

4    permitted lien of Gryphon was paid

5       It is therefore unsurprising that YAGI viewed the permitted lien of Gryphon for $1.6

6    million as "small potatoes" and readily granted same to have priority over the enforcement of

7    YAGI's security interest in the assets of Cobalis.

8    **2.    YAGI's    UCC-1    filing    also    protects    the    permitted    lien    of**

9    **Gryphon/Montenegrex**

10       The world was put on notice by the filing by YAGI of its SA in support of its UCC-1

11    filing in Nevada on December 20, 2006 and again with the U. S. Patent and Trademark Office in

12    July 2007 that Gryphon has a permitted lien against Cobalis that has priority over any lien of

13    YAGI.   The SA, which sets forth the permitted lien of Gryphon, cannot be avoided as a

14    preference as the UCC-1 filing occurred more than 3 months before YAGI filed its Chapter 7

15    Petition against Cobalis.

16       Montenegrex, now as the only creditor of Cobalis claiming permitted lien status under the

17    SA, has priority over YAGI and therefore Montenegrex must be paid its judgment, which, with

18    post-judgment interest, is in excess of $2 million, before YAGI sees a dime.

19    **3.    Montenegrex proposed satisfaction of its priority lien will benefit all parties-**

20    **in-interest.**

21       Montenegrex and Cobalis agree that partial satisfaction of the judgment can be achieved

22    by turning over to Montenegrex all of Cobalis assets, determined by this Court in June 2010 to

23    have a value of $1.5 million, depreciating at 20% per annum, 1.67% per month. This will leave

24    no assets to be administered by a Chapter 7 trustee or otherwise.  This warrants dismissal rather

25    than conversion.  Dismissal, in which Cobalis can continue its presently profitable business, is

26    plainly preferential for all parties-in-interest to a conversion in which there would be no chance

27    of recovery for anyone.

28       Montenegrex will *lease back* to Cobalis all of its former assets on favorable terms so that

29    its sale of its Pre-Histin® product can continue unimpeded and the profits generated thereby used

30    to pay all other creditors and otherwise inure to the benefit of the equity interest holders.

1        This Court's valuation, in June 2010, of all of the assets of Cobalis at $1.5 million, means

2    that the transfer of these assets to Montenegrex will pay only part of the permitted lien that

3    exceeds $2 million with post-judgment interest.

4        Because of the said 1.67% monthly depreciation, this Court ordered Cobalis to establish

5    an escrow account so that if YAGI prevailed in its disputed secured claim and in its disputed

6    unsecured, crammed- down claim, the escrowed amount would fairly compensate YAGI for the

7    depreciation of the value of the assets that would occur in the months after the date of the

8    valuation Order. Presently there is $1,550,000 in the escrow account.

9        When the 1.67% depreciation factor is applied to the said $1,5 million valuation for the

10   14 months to August 9, 2011, this equals $350,700. Thus in addition to receiving all of the

11   assets of Cobalis, Montenegrex is entitled to receive $350,700, plus $835 a day until the day of

12   payment, from the escrow account so that the total value to be received is $1,500,000. Should

13   payment be ordered and effected on the return date of this motion, August 22, 2011, the sum due

14   Montenegrex would be $350,700 + 13 days @ $835 for a total of $361,555. Otherwise $835 is

15   due Montenegrex until payment is made.

16       The remaining funds in the escrow account, all intended for the possible benefit of YAGI,

17   must inure to the benefit of Montenegrex as the only creditor asserting permitted lienor status. As

18   of the filing date of the 2011 Chapter 11 Petition, the value of the Gryphon judgment with

19   interest accrued at the federal judgment rate on April 3, 2006 is $2,057,272.27. Any suspension

20   of interest caused by the filing of the 2007 Petition was ended when the 2011 Petition was filed

21   on July 8, 2011, case number 2:11-bk-39429-EC.

22       Montenegrex is thus entitled to receive post judgment interest from the date of its

23   judgment until July 8, 2011, the filing date of the second petition. The balance of the escrow

24   account, after the said payments to Montenegrex, should be returned to the Debtor upon

25   dismissal of these cases.

26       **4.**    **The requirements of 11 U. S. C. § 362(d)(2)(A) and (B) are satisfied.**

27       The claim of Montenegrex, secured by a permitted lien on all of these assets, to be

28   discussed, *infra*, greatly exceeds the present depreciated value of the said assets. Cobalis

29   therefore has no equity in these assets thereby satisfying § 362(d)(2)(A).

1    Notwithstanding the transfer of title of these assets to Montenegrex, Cobalis can still have
2    full use of these assets for the purposes of its reorganization as Montenegrex will lease them to
3    Cobalis on favorable terms, *i. e.*, a modest contingent royalty on monthly sales, at a rate
4    acceptable to Cobalis.

5    It is plain that Cobalis cannot successfully reorganize without the use of its patents and
6    trademarks. Pre-Histin® is the Debtor's sole product and the marketing of same is contingent
7    upon a license to use the trademark and patents. Montenegrex, however, will agree, once it owns
8    the patents and trademarks, to lease-them back to Cobalis on favorable terms thereby satisfying §
9    362(d)(2)(B).

10    **(b)    The real value of YAGI's disputed claim is zero due to the usury provision of**
11    **California's Constitution.**

12    **1.    Bereft of any statutory exemption, YAGI violated Article XV, § I of the**
13    **California Constitution that limits interest rates to 10% per annum.**

14    A legal analysis of YAGI's claim reveals, *mirabile dictu*, that, under controlling
15    California and New Jersey laws pertaining to usury, YAGI has no claim whatsoever. YAGI
16    tripped up on an arcane provision of California's *Constitution* regarding *usury* that not only
17    invalidates YAGI's entire claim but also makes YAGI liable to Cobalis for millions of dollars in
18    statutory damages. California law is controlling as New Jersey law defers to another state's laws
19    on usury when the borrower is not from New Jersey.

20    The said constitutional provision limits interest on loans to 10% per annum and counts
21    upfront payments by the borrower, such as transaction and structuring fees, as interest. The
22    upfront fees paid by Cobalis add up to $415,000. When these fees are added to the nominal 8%
23    interest rate charged by YAGI on its total loan of $3,850,000, the total interest rate is over 15%.
24    This rate is not excused by California's *exemption* for commercial loans of at least $300,000 for
25    which any rate of interest can be charged because YAGI also insisted on *personal guarantees*
26    that void the exemption. YAGI, undoubtedly, believed that its $3,850,000 loan to Cobalis was
27    within the exemption. YAGI was wrong and now must suffer the consequences.

28    YAGI demanded personal guarantees of its loan from Radul and Chaslav Radovich who
29    pledged and surrendered physical control of their 8.4 million shares of Cobalis to the general
30    counsel of YAGI, acting as escrow agent. Personal guarantees invalidate the said exemption to

6

1   the 10% usury limit. This subjects YAGI to the penalties for attempted enforcement of a usury

2   claim in a bankruptcy court; these include the inability to collect the principal amount; the denial

3   of all claims for interest; and, the disgorgement of the $415,000 already paid by Cobalis, with

4   statutory trebling.

5        A loan *tainted* by a usurious rate of interest, as defined by California law, is

6   unenforceable in any court in California. The entire Security Purchase Agreement (SPA)

7   between YAGI and Cobalis, because it is usurious, is unenforceable under both the *Bankruptcy*

8   *Code*, § 502(b)(1) and California law, to which New Jersey law yields. YAGI therefore is not

9   entitled to *any payment whatsoever* from the Debtor's estate.

10       **2.    Cobalis, because of the said usury, has offsetting counterclaims against**

11  **YAGI, namely treble damages.**

12       Under California law, any usurious interest actually paid to the lender must be disgorged

13   and is subject to trebling. As Cobalis had already paid $415,000 to YAGI, it is eligible to claim

14   treble damages of $1,245,000.

15       **3.    Cobalis is entitled to its attorney's fees incurred in opposition to YAGI's**

16  **claims.**

17       Cobalis is entitled to its attorney's fees under California law. YAGI should also be

18   ordered to reimburse Cobalis its attorney's fees awarded by this Court to Cobalis attorneys in the

19   amount of approximately *ca.* $700,000, subject to the submission of an accounting, under

20   *Cal.Civ.Code* § 1717(a) which authorizes fees to the prevailing party when the other party has a

21   fee-shifting clause in effect to its benefit.

22       YAGI is not entitled to its attorney's fees. Although the transaction documents as

23   between YAGI and the Debtor provide for attorney's fees in certain circumstances, these are all,

24   under controlling New Jersey law, conditioned upon YAGI being the prevailing party. As YAGI

25   has sought over a million dollars in interest to which it is not entitled under the usury provisions

26   of California's *Constitution, supra*, YAGI is not the prevailing party and therefore is not entitled

27   to attorney's fees.

28

29

30

1    **4.    Cobalis is also entitled to apply for punitive damages.**

2    Cobalis is also eligible to seek punitive damages from YAGI. As YAGI has informed

3    this Court that it is a "billion dollar" hedge fund that has completed more than 300 PIPE

4    financing deals (the type of financing transaction at issue herein), it is likely that the California

5    public generally, comprising 10% of the nation's population, has been and may be victimized as

6    was Cobalis, a resident of California.

7    Given the wealth that YAGI has claimed, a large punitive damage award should be

8    imposed to satisfy the goals of punishment and deterrence against inflicting further harm upon

9    the public.

10    If Cobalis is granted the right to conduct limited discovery, it should expect to be able to

11    adduce proof that the usurious terms imposed on Cobalis by YAGI was imposed by YAGI on

12    others borrowers in California. If this evidence can be adduced, Cobalis will have satisfied all of

13    the requirements to submit the issue of punitive damages for adjudication.

14                                        ###

15    Based upon the payment of the entire Montenegrex claim of over $2 million; the

16    elimination of the entire YAGI claim of upwards of $8 million due to the said usury; the absence

17    of any other secured creditor in these cases; the surplus funds in the escrow account that will be

18    returned to Cobalis; the present profitability of Cobalis; the relatively small *potpourri* of

19    unsecured claims that can again accrue pre-judgment interest, to the benefit of these creditors,

20    once the cases are dismissed; can be dealt with by courts of competent jurisdiction, if not settled

21    by Cobalis. Absent the need to protect the Debtor's assets, there is no reason for the continued

22    involvement of this Court. The cases should be dismissed thereby leaving all parties-in-interest,

23    with the exception of its treatment of the claims of Montenegrex and YAGI, as the Court found

24    them. Jurisdiction however should be retained to adjudicate a plain violation of the automatic

25    stay by YAGI during the pendency of the first bankruptcy case.

26

27

28

1    **(c)**    **Cobalis should be excused from performing its contract with YAGI based on its**
2    **breach of a material provision of its contract and by breaching New Jersey's covenant of**
3    **good faith and fair dealing that is implied in every contract subject to the laws of New**
4    **Jersey.**
5

6        The SPA contains an explicit provision, § 4(l), that explicitly prohibits all short sales and
7 other hedging transactions involving the stock of Cobalis for as long as the debentures purchase
8 by YAGI under the SPA are outstanding. This is a blanket prohibition with no exceptions.

9        As there is otherwise no prohibition against short selling the shares of publicly owned
10 companies, and as SEC regulations allow the short sale of shares obtainable through convertible
11 securities, this bargained for clause was intended to give Cobalis protection otherwise
12 unavailable under the law. This paragraph of the contract, according to the rules of contract
13 construction, must be given weight and meaning. This can only be done by prohibiting the
14 shorting of shares of Cobalis, even lawfully, while the debentures are outstanding.

15

16    **(d)**    <u>**Both Chapter 11 cases of Cobalis should be dismissed.**</u>

17        **1.**    **Cobalis can continue its presently profitable operations, without**
18 **interruption, in the best interest of all parties-in-interest.**

19        After all of the assets of Cobalis have been turned over to Montenegrex, these same
20 assets will be *leased-back* by Montenegrex to Cobalis for a modest percent of future sales. In
21 this way, all parties-in-interest will continue to benefit from the sale of Pre-Histin® with Cobalis
22 paying Montenegrex a variable, affordable monthly fee tied to sales of the product for the
23 preceding month.

24        **2.**    **Both Chapter 11 cases should be dismissed, not converted to Chapter 7.**

25        After the turnover of assets and some of the escrow funds to Montenegrex, with the
26 balance to Cobalis, both the 2007 and the 2011 Chapter 11 cases should be dismissed as
27 unnecessary to protect the Debtor as it will have no assets to be administered.

28    **(e)**    **YAGI violated the automatic stay in the 2007 bankruptcy case to the detriment of**
29 <u>**all parties-in-interest.**</u>

30        Under the transaction documents between the parties, Cobalis was required to escrow
31 authorized but unissued shares *in case* YAGI wanted to exercise its contractual right to convert

9

1 its debentures into shares. These shares can be readily distinguished from authorized shares that

2 have been issued and sold to third party shareholders whose shares are beyond the jurisdiction of

3 the bankruptcy court as they belong neither to the debtor nor its estate.

4   The authorized but unissued shares were escrowed with the regular transfer agent for the

5 shares. Who owned these shares pending their possible conversion?  Clearly it was not the

6 transfer agent or YAGI.  By elimination,, the only possible owner could by Cobalis.  Thus,

7 whether the shares were held by Cobalis as debtor in possession or debtor makes no difference.

8 Any interference with the property of the debtor or the debtor's estate is violative of 11 U. S. C.

9 § 362(a)(3)(5)(6):

10   (3) any act to obtain possession of **property of the estate** or of property from the
11   estate or to exercise control over property of the estate;
12
13   (5) any act to create, perfect, or enforce against **property of the debtor** any lien
14   to the extent that such lien secures a claim that arose before the commencement of
15   the case under this title;
16   (6) any act to collect, assess, or recover a claim **against the debtor** that arose
17   before the commencement of the case under this title; [Emphasis added.]

18   Thus when YAGI, post-petition, converted its debt into these escrowed shares, it

19 interfered with the property of the Debtor and violated § 362. The remedy is for YAGI to restore

20 these shares to Cobalis by re-purchasing them in the open market.  As millions of shares are

21 involved, forcing YAGI to makes these purchases will insure to the benefit of all equity-interest

22 holders as the demand for millions of shares should drive up the share price considerably.  This

23 is another benefit, accruing to the welfare of all parties-in-interest, except YAGI, of dismissal

24 rather than conversion.

25   Cobalis therefore owns a chose-in-action that arose post-petition that it may exercise

26 against YAGI. It is therefore respectfully requested that the Court maintain jurisdiction to

27 adjudicate this claim that accrued entirely after the initial Chapter 7 Petition was filed by YAGI.

28      # IV. Statutory authority.

29   This Court has subject matter jurisdiction over bankruptcies under 28 U.S.C. §157(b)(1)

30 and § 1334.

1    This is a core proceeding under 11 U. S. C. §157(b)(2). To the extent that it is non-core,
2    Montenegrex consents to adjudication by this Court.

3    Any party in interest may object to a claim under 11 U. S. C. § 502(a).

4    Relief is sought under *Fed. R. Bankr.P.* Rule 4001(a)(2) as the Court has previously
5    announced its intention to convert to Chapter 7 or dismiss both of the Debtor's pending Chapter
6    11 cases on August 22, 2011.   Montenegrex will be irreparably harmed if its application is not
7    heard prior to a decision being made.  Hence this motion is being made on an emergency *ex*
8    *parte* basis.

9    Relief from the automatic stay may be granted under 11 U. S. C. § 362(d)(2)(A)(B) when
10   the debtor does not have equity in the subject property and such property is not necessary to an
11   effective reorganization.

12   The enforcement of a subordination agreement is permitted under § 510.

13   The voiding of claims against a debtor's estate that are unenforceable under state law is
14   required by 11 U. S. C. § 502(b)(1).

15   Usury in California is governed by the California *Constitution* Article 15, Section I.
16   and *California Corporation Code* § 25118 (b)(1).

17
# V.    **Relevant Facts**

18   Gryphon, the predecessor in interest to Montenegrex, filed a stipulated judgment, on
19   April 4, 2006, against Cobalis, in the amount of $1.6 million, in the northern district of Texas.
20   Although Gryphon immediately thereafter could have registered its judgment in California,
21   where Cobalis resides, or in Nevada, where Cobalis is incorporated, both without violating the
22   terms of a one-year non-enforcement agreement with Cobalis, Gryphon did not do so until after
23   YAGI made a UCC-1 filing on the same day it signed the loan documents and initial the funding
24   of its loan to Cobalis, both given in California. The UCC-1 filing was made in Nevada on
25   December 20, 2006.

26   To hold off Gryphon from making a prior UCC-1 filing, Cobalis explained to Gryphon
27   that it was seeking to borrow approximately $4 million and could use such funds to pay the
28   judgment.  Gryphon, in fact, offered to accept a lesser amount if payment could be made with
29   alacrity. Alternatively, Cobalis promised to protect Gryphon's prior judgment by requiring that

1    its prospective lender, in any security agreement, acknowledge the said judgment as a permitted

2    lien creating a security interest in the assets of Cobalis that would have priority over the lender.

3          Cobalis, in December 2006, borrowed $3.85 million from YAGI. . Unfortunately, in the

4    SPA, YAGI forbade Cobalis from using any of the loan proceeds to pay Gryphon. SPA, § 4. (p)

5    annexed to Olsen declaration as Exhibit "1." Cobalis was, however, true to its word in that in the

6    SA, dated December 20, 2006, liens arising from prior judgments were recognized as permitted

7    liens. YAGI was aware of Gryphon's April 2006 judgment both through its due diligence study

8    including SEC filings disclosing the said judgment

9          Montenegrex asserts that its claim of the original $1.6 million judgment, and accrued

10    interest at the federal judgment rate as of April 2006, which amounts to approximately $400,000,

11    must, as a permitted lien, be paid ahead of any payment to YAGI.

12          Montenegrex will accept a transfer of all of the assets of Cobalis, as partial satisfaction of

13    its security interest in the assets of Cobalis, to the extent of $1,200,000. This is based on this

14    Court's Valuation Order of $1,500,000 less depreciation of the assets as the Court prescribed rate

15    of 20% per annum. Cobalis consents to this balance to be disbursed from the escrow account

16    along with the accumulated said post-judgment interest. Montenegrex consents to lend a

17    substantial proportion of these funds to Cobalis to factor retail invoices. This will benefit all

18    parties-in-interest. In addition Montenegrex will lease-back the assets, including the patents and

19    trademarks, to Cobalis for a modest royalty based on monthly sales with no minimum payment

20    required.

21          Should this Court view the permitted lien of Montenegrex to be payable only if the lien of

22    YAGI is allowed, Cobalis has informed Montenegrex that, if necessary, Cobalis is willing to

23    consent to so much of YAGI's claim as is required to permit this Court to issue an order to pay

24    Montenegrex, as set forth, *supra*. Otherwise Montenegrex simply asserts its priority as the

25    permitted lienor of Cobalis and the consent of Cobalis to pay out the Montenegrex claim by a

26    transfer of all assets valued at $1,200,000 and a cash payment from the escrow account's balance

27    of $1.55 million for the balance of the Montenegrex claim.

28          The SPA calls for Cobalis to pay 8% annual interest on a loan of $3,850,000. Cobalis

29    also paid upfront transaction fees of $415,000. When these fees are factored in as interest, the

1    total annual rate is 16%, far in excess of California's constitutional limitation of 10%. The usury

2    exemption for commercial loans was lost when YAGI asked for and obtained the individual

3    pledges of Radul and Chaslav Radovich.

4        The SPA in its § 4(l) contains an explicit representation by YAGI that it will not sell

5    short or otherwise engage in hedging transactions with Cobalis shares during the pendency of the

6    debentures. It is undisputed that but for this provision, it would be lawful for YAGI to do so.

7    YAGI breached New Jersey's covenant of good faith and fair dealing because it intended all

8    along to short Cobalis shares and in fact shorted millions of shares of Cobalis while the

9    debentures were pending.

10       The SPA requires that Cobalis reserve for issuance to YAGI an "Initial Share Reserve" of

11    10,583,737 shares subsequently to be increased to 15,400,000 shares ("Share Reserves"). SPA, §

12    4.(e), annexed to Olsen's declaration as Exhibit "1." . These shares are later referenced in the

13    instructions to the transfer agent. *Id*, § 5. YAGI obtained millions of these reserved shares, post-

14    petition, when it converted its debentures into shares. This, it will be shown, violated the

15    automatic stay.

16                           **VI.   ARGUMENT**

17    **(a)    It was the clear intent of YAGI and Cobalis that Gryphon's lien on all of the assets**
18    **of Cobalis take seniority over any lien of YAGI.**

19

20    **1.    Gryphon forebeared from registering in Nevada and California its Texas**
21    **judgment against Cobalis based upon the promise of Cobalis that Gryphon's judgment**
22    **would be disclosed in the SA, as it came to be, as a permitted lien.**

23        The inter-relating circumstances of Gryphon, Cobalis and YAGI clarify why Cobalis and

24    YAGI provided Gryphon with a permitted lien in their SA. SA annexed to the accompanying

25    declaration of Rey Olsen (Olsen) as Exhibit "2."

26        Gryphon could have at any time after the entry of its judgment on April 6, 2006,

27    registered its judgment in California or Nevada without violating its covenant with Cobalis not to

28    enforce the judgment for one year.

29        The stay of enforcement of a judgment under *FRCP* 62(a) does not bar registration of the

30    judgment. *In re Vanden Bossche* 125 B.R. 571, 574 (N.D.Cal. 1991). Accord, *In re McDonell*

1    204 B.R. 976, 979 (9th Cir.BAP (Cal.) 1996) "And, the abstract (or certified copy) may be

2    recorded notwithstanding the *FRCP* 62(a) 10–day automatic stay on enforcing judgments."

3    Had Gryphon, before December 20, 2006 (the date of YAGI's UCC-1 filing in Nevada)

4    exercised its right, notwithstanding its promise not to enforce its judgment for one year, to file its

5    Texas district court judgment with a California district court under 28 U.S.C. § 1963 and then

6    register that judgment with the California Secretary of State, and taken a first priority lien

7    position over all of the personal property of Cobalis, it is unlikely that YAGI would have

8    accepted the position of junior secured creditor. YAGI would not have purchased $3.850 million

9    in debentures from Cobalis.

10    YAGI, under controlling Nevada statutory law, had actual knowledge of Gryphon's

11    judgment before it contracted with Cobalis and made its UCC-1 filing in Nevada.

12    1. Subject to subsection 6, a person has "notice" of a fact if the person:
13        (a) Has actual knowledge of it;
14        (b) Has received a notice or notification of it; or
15        (c) From all the facts and circumstances known to the person at the time in
16            question, has reason to know that it exists.
17    2. "Knowledge" means actual knowledge. "Knows" has a corresponding meaning.
18    *NRS* 104.1202 Notice; knowledge.
19

20    Therefore Cobalis and YAGI, recognizing the forbearance of Gryphon as valid

21    consideration, provided Gryphon with the same protection in the assets of Cobalis as if Gryphon

22    had registered its judgment against Cobalis ahead of YAGI's UCC-1 filing.    This is why the

23    judgment of Gryphon is described as a "permitted lien" in the Security Agreement between

24    YAGI and Cobalis. SA annexed hereto as Exhibit "2." When the intent of the parties is clear, the

25    courts will enforce same. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264

26    (1992)).

27    **2.    The doctrine of promissory estoppel is recognized and enforced in California**

28    **and New Jersey.**

29    As discussed *supra*, Gryphon could have registered its judgment in California or Nevada

30    at any time after it was entered in April 2006 by a federal court judge in the northern district of

31    Texas. Cobalis, however, asked Gryphon not to do same so that Cobalis could enter into a loan

1  agreement untainted by a perfected lien. As a reward to Gryphon for its forbearance, Gryphon

2  was granted "permitted lien" status in the SA between Cobalis and YAGI.

3      The promise of this status that allowed Gryphon to substitute itself ahead of YAGI as a

4  lienor on the pledged assets of Cobalis was relied upon by Gryphon which did not register its

5  judgment in California until well after YAGI had made its UCC-1 filing in Nevada and Cobalis

6  had received all of the loan proceeds by the end of April 2007.

7      Promissory estoppel applies whenever a "promise which the promisor should
8      reasonably expect to induce action or forbearance on the part of the promisee or a
9      third person and which does induce such action or forbearance" would result in an
10     "injustice" if the promise were not enforced. (Rest.2d Contracts, § 90(1).)
11  *Lange v. TIG Ins. Co.* 68 Cal.App.4th 1179, 1185 (Cal.App. 2 Dist. 1998)
12
13     New Jersey also recognizes the doctrine of promissory estoppel when it relates, as herein,

14  to the forbearance by Gryphon of its existing right at any time after April 2006 to register its

15  judgment in any state.  Gryphon was induced to forbear by the promise of Cobalis, with the

16  knowledge and consent of YAGI, that the Security Agreement as between Cobalis and YAGI

17  would give Gryphon permitted lien status, as it did.

18     Promissory estoppel is applicable to *in futuro* promises where they relate to an
19     intended abandonment of an existing right or are made to influence others who, in
20     fact, are induced thereby to act or to forbear. *Friedman v. Tappan Development*
21     *Corp.*, 22 *N.J.* 523, 537, 126 *A.*2d 646 (1956). A promise which the promissor
22     should reasonably expect to induce action or forbearance of a definite and
23     substantial character on the part of the promisee, and which does induce such
24     action or forbearance, is binding if injustice can be avoided only by enforcement
25     of the promise. *Id.* at 538, 126 *A.*2d 646; *Restatement, Contracts* 2d, § 90.
26  *Royal Associates v. Concannon* 200 N.J.Super. 84, 91 (N.J.Super.A.D.1985)
27
28     It would thus be unjust if the permitted lien status of Gryphon were not enforced by this

29  Court.

30     **3.    The doctrine of *equitable subrogation*, is recognized under New Jersey and**
31  **California law; the latter holds that subrogation is unaffected by the UCC-1 filing of YAGI.**
32
33     It is undeniable that Gryphon's judgment was entered in April 2006 and that the YAGI

34  loan was made months later in December 2006 and that YAGI was completely aware of

1    Gryphon's judgment and its forbearance in registering it judgment in either California or

2    Nevada. Without this forbearance, it is probable that the loan never would have been made.

3          Thus apart from the acknowledgement in the SA that Gryphon has a permitted lien,

4    Gryphon is entitled to equitable subrogation under New Jersey law. The doctrine of equitable

5    subrogation is "highly favored in the law." *Montefusco Excavating & Contracting Co. v.*

6    *Middlesex County,* 82 N.J. 519, 523 (1980).

7          The equitable doctrine of subrogation is also recognized in California.

8          Subrogation, a legal fiction, is broadly defined as the substitution of one person in

9          the place of another with reference to a lawful claim or right.

10    *State Bar of California v. Statile* 168 Cal.App.4th 650, 662 (2008)

11

12          Once the SA was signed by YAGI, the lien position of Gryphon in the assets of Cobalis

13    was fixed. The subsequent UCC-1 filing did not change same under the New Jersey law that the

14    parties stipulated covers their agreements.

15          This court has recently suggested, and the uniform holdings elsewhere are in

16          accord, **that no particular section of Article 9 of the Code displaces the**

17          **doctrine of equitable subrogation where the latter is properly invocable as a**

18          **matter of substantive law.** Stevlee Factors, Inc. v. State, 144 N.J.Super. 346, 365

19          A.2d 713 (App.Div.1976), aff'g o. b. 136 N.J.Super. 461, 346 A.2d 624

20          (Ch.Div.1975); French Lumber Co. v. Commercial Realty & Finance Co., 346

21          Mass. 716, 195 N.E.2d 507 (Sup.Jud.Ct.1964); National Shawmut Bank of

22          Boston v. New Amsterdam Cas. Co., 411 F.2d 843 (1 Cir. 1969); In re J. V.

23          Gleason Co., 452 F.2d 1219 (8 Cir. 1971); Hillman's Equipment, Inc. v. Central

24          Realty, Inc., 144 Ind.App. 18, 242 N.E.2d 522, 525 (Ct.App.1969) mod. other gr.

25          253 Ind. 48, 246 N.E.2d 383 (Sup.Ct.1969); *136 Bruer v. Sanford Atlantic

26          National Bank, 247 So.2d 764 (Fla.Dist.Ct.1971); Mid-Continent Cas. Co. v. First

27          National Bank & T. Co., 531 P.2d 1370 (Okl.Sup.Ct.1975). [Emphasis added.]

28    *Kaplan v. Walker* 164 N.J.Super. 130,135-36 (1978)

29          Under the case law of California, the place where the agreement was made by the parties

30    thereto were both California residents, YAGI (San Diego County) and Cobalis (Orange County).

31    The SA benefited Gryphon by designating Gryphon's lien as permitted, YAGI substituted

32    Gryphon in its place to exercise its rights relating to YAGI's security interest.

33          Subrogation is defined as the **substitution of another person in place of the**

34          **creditor or claimant to whose rights he or she <u>succeeds</u> in relation to the debt**

16

1  **or claim.** By undertaking to indemnify or pay the principal debtor's obligation to
2  the creditor or claimant, the "subrogee" is equitably *subrogated* to the claimant (or
3  "subrogor"), **and succeeds to the subrogor's rights against the obligor.** (Black's
4  Law Dict. (6th ed. 1990) p. 1427, col. a.) [Emphasis added.]

5  *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* 65 Cal.App.4th 1279, 1291 (1998)

6  YAGI's claim therefore must be equitably subrogated to Montenegrex claim.

7  **4.    Under New Jersey substantive law, if YAGI were to obtain assets of Cobalis**
8  **and not turn them over to Montenegrex, it would be unlawful.**

9  As the SA recites that Gryphon has a permitted lien, YAGI would be under the obligation

10  to turn over to Gryphon/Montenegrex all property that it received from Cobalis up to the amount

11  of Gryphon's lien.  As the Gryphon judgment was entered at $1.6 million on April 6, 2006, and

12  as Judge Albert entered an Order in June 2010 valuing all of the assets of Cobalis at $1.5 million,

13  YAGI could not under any circumstance foreclose upon the assets of Cobalis as they belong

14  entirely to Montenegrex.

15
16  A person who purposely obtains or retains property **upon agreement or subject**
17  **to a known legal obligation to make specified payment or other disposition,**
18  whether from such property or its proceeds or from his own property to be
19  reserved in equivalent amount, is guilty of theft if he deals with the property
20  obtained as his own and fails to **make the required** payment or **disposition.**
21  [Emphasis added.]

22  *N.J.S.A.* 2C:20-9. Theft by failure to make required disposition of property received.
23

24  New Jersey enforces this section against entities with knowledge of a known legal

25  obligation to turn property over to another and who do not.  *State v. Pessolano*, 343 N.J.Super.

26  464, 778 A.2d 1153 (A.D.2001), certification denied 170 N.J. 210, 785 A.2d 438.  Punishment is

27  inflicted upon the officer of financial institutions who withhold valuables that they know belongs

28  to another. *State v. Kelly*, 204 N.J.Super. 283, 498 A.2d 784 (A.D.1985), certification denied 103

29  N.J. 496, 511 A.2d 669, certification denied 103 N.J. 497, 511 A.2d 669.

30  It must be emphasized that YAGI has received no assets of Cobalis to date.  Rather this

31  Court is being asked to Order that the assets that YAGI would be required to turn over to

32  Gryphon/Montenegrex indirectly as permitted liens, be turned over to Montenegrex directly by

33  Cobalis.

17

1      **5.     The SA as between YAGI and Cobalis clearly provides that Gryphon, as the**
2 **holder of a lien arising from a judgment, has a security interest in the assets of Cobalis; this**
3 **security interest, described as a permitted lien, takes precedence over any security interest**
4 **of YAGI in the same assets.**

5      The SA clearly acknowledges that the permitted lien of Gryphon, arising from its pre-
6 existing judgment, creates a security interest in the assets of Cobalis that has priority over any
7 later lien of YAGI.

8      In its § 4.2, the Security Agreement (SA) clearly refers to a "security interest created by
9 this Agreement and other Permitted Liens." SA annexed to Olsen declaration as Exhibit "2." The
10 SA is subject to the laws of New Jersey. It has been held that in New Jersey a judgment is a lien
11 on property by virtue of *N.J.S.A.* 46:22-1. *Tobar Const. Co. v. R.C.P. Associates* 293 N.J.Super.
12 409, 412-413 (N.J.Super.A.D.1996)  There can therefore be no doubt that this unconditional
13 permitted lien creates a security interest in the assets of Cobalis.

14      The same section,§ 4.2,  of the SA, then goes on to say "[p]ermitted liens means (9) Liens
15 arising out of the existence of judgments or award which judgments or awards do not constitute
16 an Event of Default;"  The judgment of Gryphon against Cobalis was entered in a federal court
17 in the northern district of Texas on April 3, 2006 and filed in this Court on March 7, 2007 under
18 Case #: 8:07-cv-00473-JVS-AGR.

| 03/07/2007 | 1 | CERTIFICATION OF JUDGMENT received from Northern District of Texas, case number 3:04-cv-2405 L entered in the sending district on 4/3/06. Entered in this district on 3/22/07., filed by plaintiff Gryphon Master Fund LP.(dmjr, ) (Entered: 03/22/2007) |
|---|---|---|

19      A copy of the Judgment is annexed to Olsen's declaration as Exhibit "3."

20      When the SA was executed on December 20, 2006, YAGI had active awareness of the
21 Gryphon judgment--as can be demonstrated:

22         *     The first words of its § 4.2 states that "Except as disclosed on the SEC
23 Documents...."  The documents that Cobalis previously filed with the SEC disclosed the
24 Gryphon judgment. SEC documents annexed to Olsen's declaration as Exhibit "45."

25         *     YAGI collected a fee of $7,500 to conduct a due diligence study of
26 Cobalis. SPA, § 4. (g) (iii) annexed to Olsen's declaration as Exhibit "1."

1          *      The SPA explicitly states that Cobalis must not use any of the loan
2    proceeds to pay Gryphon. *Id,* § 4. (p).

3          It was unsurprising that YAGI would consent to the permitted lien of Gryphon in view of
4    YAGI's high estimate of the value of the collateral . In 2006, YAGI's internal expert, an
5    employee named David E. Reese, Ph. D. (Reese), estimated the market capitalization of Cobalis,
6    by making reference to analogous public companies, of at least $82.19 million and as much as
7    $264.34 million, based upon the market caps of stocks that he evaluated as comparable.  Reese
8    estimate annexed to the accompanying declaration of Rey Olsen (Olsen) as Exhibit "5."

9          Furthermore, YAGI made Radul and Chaslav Radovich pledge their shares of Cobalis as
10   additional security.  On the loan transaction date, December 20, 2006, these shares had a market
11   value of $6.3 million according to Yahoo Financial.

12   http://finance.yahoo.com/q/hp?s=CLSC.PK&a=11&b=20&c=2006&d=11&e=21&f=2006&g=d

13         It is therefore inescapable that giving Gryphon's judgment permitted lien status was
14   carefully considered by YAGI and Cobalis.  Their agreement must be enforced by this Court to
15   the benefit of Montenegrex.

16         **6. The term "permitted lien" has a clear, commonplace meaning as it is extensively**
17   **used by courts to describe an interest in an asset being conveyed that is subject to an**
18   **encumbrance.**

19         The referral of encumbrance of an asset due to a prior agreement as a permitted lien is
20   well-known in the bankruptcy courts.

21               and the Postpetition Obligations of the Debtors will constitute an allowed
22         claim under Bankruptcy Code §§ 364(c)(2), (c)(3), and (d)(1) senior to all other
23         liens and claims, and subject and subordinate only to the Carve–Out and
24         **Permitted Liens.** [Emphasis added.]
25   *In re 944 Media, LLC* 2010 WL 4520059, 3 (Bkrtcy.C.D.Cal. (2010))
26

27               the assets of the Debtors constituting "Collateral" as defined in the respective DIP
28         Financing Documents (but excluding any actions or proceeds of actions under
29         Chapter 5 of the Bankruptcy Code and **subject to any prior permitted liens**
30         **under the Prepetition Credit Agreement),** [Emphasis added.]
31   *In re Lazy Days' R.V. Center, Inc.* 2009 WL 7226969, 2 (Bkrtcy.D.Del. (2009))

19

1    Whenever used in reference to assets and their prospective encumbrance, the term

2    permitted lien means that the intended encumbrance is subject to the permitted lien. In our case,

3    the security interest of YAGI in the assets of Cobalis, as created by the SA, was subject to the

4    prior permitted lien of Gryphon in those same assets.

5    **7.    The Confirmed Plan retained the liens of YAGI, as set forth in the SA.**

6    The Confirmed Plan provides in its § VI. B. that "[t]he confirmation of the Debtor's Plan

7    re-vests all of the property of the Estate in Debtor." This property, however, remains subject to

8    the lien of YAGI. Section § VI. C. As YAGI, in the SA, granted priority lien status to Gryphon,

9    to the extent of its allowed claim of slightly more than $2 million, its successor, Montenegrex,

10   must be paid ahead of YAGI

11   **8.    The SA, in allowing for Montenegrex permitted lien, is in effect a**
12   **subordination agreement in favor of Montenegrex.**

13

14   As a permitted lien, as a variant on a subordination agreement, is enforceable under non-

15   bankruptcy law, it is enforceable in this case.

16   Section 510(a) provides that "[a] subordination agreement is enforceable in a case
17   under this title to the same extent that such agreement is enforceable under
18   applicable nonbankruptcy law." 11 U.S.C. § 510(a).
19   *In re TCI 2 Holdings, LLC* 428 B.R. 117, 140 (Bkrtcy.D.N.J. (2010))

20

21   This Court should therefore enforce the permitted lien of Montenegrex as agreed to by

22   YAGI and Cobalis.

23

24   **9.    Even without the SA, YAGI was aware of Gryphon's judgment.**

25   In California, where the transaction as between YAGI and Cobalis was consummated, the

26   judgment of Gryphon nonetheless was effective against YAGI as YAGI had actual knowledge of

27   Gryphon's judgment as demonstrated by its reference to same in the SA.

28

29   Putting it another way, "[a]n unrecorded instrument is valid as between the parties
30   thereto *and those who have notice thereof.*" (Civ.Code, § 1217, italics added.)
31   That the instrument may have been unrecorded as the result of negligence or
32   unclean hands does not change the fact that Barak had notice of it and it is
33   therefore valid as to Barak.

34   *Lewis v. Barak Enterprises, Inc* 2011 WL 1549778, 11 (Cal.App. 2 Dist. (2011))

20

New Jersey case law also recognizes unequivocally that a lender who knows of a prior unrecorded instrument has a security interest that is subject to the prior lien. *PNC Bank v. Axelsson* 373 N.J.Super. 186, 195 (N.J.Super.Ch. (2004)).

As YAGI had knowledge of Gryphon's lien, its security interest against Cobalis must be subrogated to Montenegrex.

> Subrogation is an equitable doctrine that the law recognizes and applies for the purpose of securing justice between the parties. Employers etc. Ins. Co. v. Pacific Indem. Co., 167 Cal.App.2d 369, 376 [3], 334 P.2d 658.

*Columbia Southern Chemical Corporation V. Manufacturers And Wholesalers Indemnity Exchange* 190, 205 Cal.App.2d 194 (1961)).

> We begin by noting that subordination agreements, like contracts in general, are subject to the rule that they must be interpreted to enforce the objective intent of the parties. ( *Klingele, supra,* 192 Cal.App.3d at p. 1485, 238 Cal.Rptr. 199.)

*Bratcher v. Buckner* 90 Cal.App.4th 1177, 1186 (Cal.App. 4 Dist. (2001))

There is nothing in the SA that gives YAGI a first priority position; it is instead clear that YAGI is subordinate to the permitted lien of Gryphon. *Cf., Swiss Property Management Co., Inc. v. Southern California IBEW-NECA Pension Plan* 60 Cal.App.4th 839, 843, (Cal.App. 4 Dist. (1997)).

**10.    YAGI's affirmative knowledge of and consent to the permitted lien requires that YAGI act in the best interest of Montenegrex.**

Under governing New Jersey law, if Cobalis defaulted and triggered the SA, YAGI could not accept payment from Cobalis of its putative security interest in Cobalis assets without first insuring that Montenegrex was paid its permitted lien, regardless of whether the interest of Montenegrex was recorded or not.    What matters is that YAGI had *actual knowledge* of Gryphon's April 6, 2006 judgment when it recorded its security interest on December 20, 2006.

> Thus, a document that could have been recorded but was not is invalid as against any subsequent purchaser or interest holder who takes without knowledge of the unrecorded document. **This statute specifically provides, however, that the**

**unrecorded interest is not void against a later-recorded interest taken with**
**knowledge, actual or constructive, of the unrecorded interest.** [Emphasis
added.]
*PNC Bank v. Axelsson*, p. 190

Earlier this year, a bankruptcy court in Pennsylvania, relying upon *Axelsson* to interpret
New Jersey law, reasoned:

The *Axelsson* court agreed with the holder of the easement, reasoning that ' a
purchasing mortgagee with knowledge should not emerge from a sale in a better
position with respect to an unrecorded interest than existed prior to the sale."
***
A foreclosing mortgagee who purchases is in a somewhat different situation than
a purchasing stranger. The considerations militating in favor of protection of
third-party purchasers simply do not apply to a purchasing mortgagee. *If that*
*mortgagee has knowledge of an unrecorded interest when it takes its mortgage, it*
*is not entitled to protection.* Indeed, the knowing mortgagee is specifically subject
to the known unrecorded interest. [Italics in original.]
*In re Theokary* 444 B.R. 306, 320 (Bkrtcy.E.D.Pa. (2011))

YAGI referenced the unconditional permitted lien of Gryphon in the SA, § 4.2(2) as
Gryphon's judgment and creditor status were disclosed to YAGI by Cobalis. SA annexed hereto
as Exhibit "2"

There can be no question of this as in ¶ 4(p) of the SPA, executed by YAGI and Cobalis
on December 20, 2006, it states, "The Company shall not use any proceeds from the sale of the
Convertible Debentures, either directly or indirectly, to repay any amounts owed to Gryphon
Master Fund." SPA annexed hereto as Exhibit "1." YAGI clearly wanted Gryphon not to look
to the loan proceeds for repayment but to the underlying assets of Cobalis against which YAGI
agreed that Gryphon would have an unconditional, permitted lien.

Thus as YAGI had *actual knowledge* of Gryphon's judgment when it lent money to
Cobalis, and as the Security Agreement reflects the intent of YAGI that Gryphon have an
unconditional permitted lien ahead of YAGI's claim against the assets of Cobalis, YAGI must
honor the permitted lien and permit Montenegrex to be paid in full ahead of YAGI.

**11.    Montenegrex has standing, as the successor of Gryphon to demand that**
**Gryphon's permitted lien be paid ahead of any other payment from Cobalis to YAGI.**

22

1
2          Montenegrex is a creditor beneficiary of the agreement between YAGI and Cobalis.  As

3  such Montenegrex has standing to demand that its permitted lien be paid ahead of any payment

4  due YAGI for its security interest. Both California and New Jersey law provide that when a

5  clause in a contract is made for the benefit of a named entity, that entity may sue to enforce the

6  benefit due it under the contract.

7          "California law permits third party beneficiaries to enforce the terms of a contract
8          made for their benefit. Civil Code section 1559 states: 'A contract, made
9          expressly for the benefit of a third person, may be enforced by him at any time
10         before the parties thereto rescind it.' The third party need not be identified by
11         name. It is sufficient if the claimant belongs to a class of persons for whose
12         benefit it was made. ( *Marina Tenants Assn. v. Deauville Marina Development*
13         *Co.* (1986) 181 Cal.App.3d 122, 128 [226 Cal.Rptr. 321].)
14  *Initiative Partners v. California Dept. of Health Services* 2006 WL 2423550, 11 (Cal.App. 2
15  Dist. (2006)).
16
17         There can be no doubt that a contract between two parties can bestow legally
18         enforceable rights, or impose enforceable obligations, on persons who are not
19         parties to the contract.
20  *McBride v. Minstar, Inc.* 283 N.J.Super. 471, 499 (N.J.Super.L. (1994)).
21
22         The UCC-1 filing used to benefit YAGI, referenced by name in the transaction

23  documents, as it puts the world on notice of Gryphon's lien, enables Montenegrex to step into the

24  shoes of YAGI and assert YAGI's security interest against all other creditors up to the amount of

25  Gryphon's total claim.   Only when Montenegrex claim is paid in full, may YAGI expect to

26  receive its first penny from its security interest in the assets of the estate. Thus YAGI cannot be

27  paid a penny until Montenegrex is paid in full for the amount of its judgment and post-petition

28  interest.  These are calculated to total $2,005,951.

29         **12.      The change of priorities agreed to by YAGI in its agreement with Cobalis**
30  **inures to the benefit of Montenegrex but does not affect the rights of other creditors.**
31
32         Enforcement of subordination agreements between creditors of the same bankrupt, *i. e.,*

33  YAGI and Montenegrex, affects only their rights and does not interfere with or change rights of

34  other creditors. *In re Wyse*, 340 F.2d 719 (6th Cir. (1965)).

23

1    **13.    Montenegrex is entitled to increase its claim for the post-judgment interest**
2    **that stopped running when YAGI filed its Petition against Cobalis on August 1, 2007.**
3
4    Montenegrex permitted lien is now $2,005,951, *viz:* the federal judgment interest rate is
5    set by 28 U.S.C. § 1961(b). On April 3, 2006 the rate was 4.82%. The period between April 3,
6    2006 and July 8, 2011 (the filing date of the second Chapter 11 Petition) is 5 years and 95 days.
7    The yearly interest on $1.6 million at 4.82% is therefore $77,120 and the daily rate is $214.22.
8    This works out to total interest of $405,951 through July 8, 2011. When this $405,951 is added
9    to the $1.6 million judgment, Montenegrex is owed $2,005,951. This figure reflects the addition
10    of 4 years interest that was stopped from running by the filing of the Chapter 7 Petition against
11    Cobalis on August 1, 2007. By filing a second Petition on July 8, 2011, Cobalis gave up this
12    protection and entitled Montenegrex to 4 years of additional interest. While no case was found
13    directly on point for a civil claim, the U. S. Supreme Court did find that interest owing the IRS
14    that was not discharged during the prior bankruptcy could be sought in the successive filing.
15    *Bruning v. United States*, 376 U.S. 358 (1964). This holding has been followed by multiple
16    courts. *See In re Burns*, 887 F.2d 1541, 1543 (11th Cir.1989); *In re Hanna*, 872 F.2d 829, 830–
17    31 (8th Cir., 1989); *Geving v. United States*, 93 B.R. 742, 743 (D.Wyo.1986); *In re Cline*, 100
18    B.R. 660, 662–63 (Bankr.W.D.N.Y.1989); and *In re Mitchell*, 93 B.R. 615, 617–18
19    (Bankr.W.D.Tenn.1988).
20    The above reasoning was drawn out recently in the opinion of a bankruptcy court in the
21    Southern District of New York. When a prior plan that does not provide for the payment of post-
22    petition interest does not result in a discharge, the interest that accrued during the prior case,
23    once dismissed, is an allowed accrual.

24    The Court thinks the better analysis is that of the *Hess* court and finds instead
25    that 11 U.S.C. § 502(b)(2) prohibited the payment of interest through Debtor's
26    plan. When the Debtor did not obtain a discharge in his second Chapter 13 filing,
27    the interest due on his tax debt matured upon dismissal of his case, and the
28    interest was due and payable when the third case was filed. It is therefore properly
29    claimed against his estate in the present filing. "If the debtor received a discharge
30    of the taxes underlying the penalties and interest, they would disappear. If not,
31    they simply reappear, as though the bankruptcy had not intervened." *See Hess*,
32    173 B.R. at 429. The IRS' claim for interest and penalties that accrued during the
33    earlier case is therefore allowed.
34    *In re Moore* 307 B.R. 394, 398 (Bkrtcy.S.D.N.Y. (2004))

24

1    An Order has been entered setting the value of all of the assets of Cobalis at $1.5 million.

2    Docket No. 506 entered on May 27, 2010.   Since $2,005,951 exceeds the $1.5 million by

3    $505,951, this will be the remaining unsecured claim of Montenegrex after the patents and

4    trademarks of Cobalis are assigned to Montenegrex.

5    This difference of $505,951 remains a priority claim against YAGI which can collect

6    none of its unsecured claim until Montenegrex, as the permitted lienor, has been paid in full.

7    **14.    There is no issue of lien avoidance by the trustee, the debtor in possession,**

8    **which otherwise should find the offer of Montenegrex highly favorable.**

9

10    The issue of lien avoidance as a preference by the trustee does not arise as Montenegrex

11    asserts no lien against any creditor except YAGI and Cobalis which both agreed in the SA to

12    treat the judgment of Gryphon as an unconditional permitted lien.  As this agreement predates

13    the August 1, 2007 Chapter 7 filing by more than 90 days, it cannot be avoided as a preference.

14    The trustee, the debtor-in-possession, therefore is involved only to the extent that it

15    consents to the turnover of all of the assets of the estate, including the patents and trademarks, in

16    exchange for partial satisfaction of Montenegrex claim.

17    **15.    As the amount of Montenegrex permitted lien exceeds this Court's valuation**

18    **of all of the assets of Cobalis,  and as Cobalis agrees that all of its assets should be turned**

19    **over to Montenegrex in partial satisfaction of its judgment and post-judgment interest**

20    **against Cobalis, this Court should order same.  Montenegrex will then lease these assets**

21    **back to Cobalis so that its business of selling Pre-Histin® can continue.**

22    This Court valued all of the assets of Cobalis at $1.5 million. Docket No. 506 entered on

23    May 27, 2010.  This is a final order that was not appealed.

24    Since Montenegrex permitted lien arises from the claim that it purchased from Gryphon

25    that consisted solely of its judgment against Cobalis, the amount of Montenegrex claim can be

26    calculated easily by adding post judgment interest to the $1.6 million judgment entered on April

27    3, 2006 to the date of filing of the second Chapter 11 petition which ends the accumulation of

28    interest.

29    Once the assets have been turned over to Montenegrex, it will lease them back to Cobalis

30    on favorable terms, namely a percent contingent on actual sales.  The lease will be for successive

31    one year terms and will be renewable for so long as Messrs. Chas. Radovich and Marty Marion

32    are employed by Cobalis.

1    In this way Cobalis can continue in business to earn funds to enable Cobalis to pay its
2    other creditors, all unsecured.

3    **16.    Since this Court determined that the value of Cobalis assets, largely patents**
4    **and trademarks, lose value at the rate of 20% per year, Montenegrex must also receive**
5    **from the escrow account the sum of $361,555.**

6    When the 1.67% depreciation factor is to the $1,500,000 valuation for the 14 months to
7    August 9, 2011, this equals $350,700. Thus in addition to receiving all of the assets of Cobalis,
8    Montenegrex is entitled to receive $350,700, plus $835 a day until the day of payment, from the
9    escrow account so that the total value to be received is $1,500,000. Should payment be ordered
10    on the return date of this motion, August 22, 2011, the sum due Montenegrex would be $350,700
11    + 13 days @ $835 for a total of $361,555.

12    The *amount* to be paid to party subordinating its claim is determined without reference to
13    the subordination agreement. Once the amount is determined, however, it is then paid to the
14    subrogee to the extent of its valid interest through the subordination agreement, with any
15    remaining balancing going to the subrogor. *In re Smith*, 77 B.R. 624 (Bkrtcy.N.D.Ohio (1987)).
16    In the present circumstances, the entire amount of YAGI's security interest, valued by this Court
17    at $1.5 million, is subsumed by the Montenegrex claim.
18    As calculated above, a disbursement from the escrow account to Montenegrex should be
19    Ordered in the amount of $361,555.

20    **17.    Even if viewed as a sale of assets under  11 U. S. C. § 363(f), all requirements**
21    **are met.**

22    Because, after the dismissal or suspension of this case, YAGI can litigate its claim against
23    Cobalis in the forum of its choice, New Jersey, this sale is permissible under the Code.

24    Section 363(f) is in the disjunctive, such that the sale free of the interest
25    concerned may occur if any one of the conditions of § 363(f) have been met.
26    2 *Collier on Bankruptcy*, ¶ 363.07.
27
28    As YAGI would maintain that it could litigate its claim against Cobalis in New Jersey but
29    for this bankruptcy proceeding, a sale under § 363(f) is proper.

1    Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may

2    occur if any one of the conditions of § 363(f) have been met. 2 *Collier on Bankruptcy,* ¶ 363.07.

3    One of the conditions is whether YAGI can be compelled to accept a § 363(f) sale even if the

4    amount of the sale is less than the amount of its claim.  The short answer is that it is the *value* of

5    its secured claim that governs, not the amount.  As this Court has determined that the value of all

6    of the assets of Cobalis is $1.5 million, YAGI cannot have a secured claim for more than $1.5

7    million.  YAGI could therefore be compelled to accept $1.5 million in full satisfaction of its

8    secured claim.  Under the terms of this offer, Montengrex will reduce the amount of its claim by

9    $1.5 million in exchange for the sale.  Thus full value is being received by the Debtor.

10    The section provides that as long as the junior interest "could be compelled" it is

11    sufficient to authorize a § 363(f)(5) sale. There is no requirement that the legal or

12    equitable proceeding compelling the acceptance of less than full value actually

13    occur prior to the § 363(f)(5) sale, or if at all. Furthermore, if the "legal or

14    equitable proceeding" contemplated by § 363(f0(5) would result in the junior lien

15    holder receiving nothing, then a § 363(f)(5) sale that pays them nothing or gives

16    them an unsecured claim to be redeemed for some dollar amount would appear to

17    be permissible. *See e.g. Scherer v. Federal Nat'l Mortgage Ass'n (In re Terrace*

18    *Chalet Apartments Ltd.),* 159 B.R. 821, 829 (N.D.Ill.1993)(adopting the view

19    "authoriz[ing] the sale and consequent lien extinguishment if the creditor could be

20    crammed down pursuant to Section 1129(b)(2)"); *In re Gulf States Steel,* 285 B.R.

21    497, 508 (Bankr.N.D.Ala.2002)(noting that **"Section 363(f)(5) permits a sale**

22    **free and clear if the trustee can demonstrate the existence of another legal**

23    **mechanism by which a lien could be extinguished without full satisfaction of**

24    **the secured debt.").** [Emphasis added.]

25    *In re Levitt & Sons, LLC* 384 B.R. 630, 648 (Bkrtcy.S.D.Fla.(2008))

26    If the Debtor as trustee is in favor of the sale of all of the Debtor's assets to Montenegrex

27    for a reduction of the allowed claim of Montenegrex by $1.5 million, YAGI can have no

28    cognizable objection.

29    **YAGI has no legally enforceable claim against Cobalis under California law.**

30    **(b)    The transaction documents between YAGI and Cobalis are usurious since the rate**

31    **of interest is over 15% and while the underlying loan is commercial and over $300,000 thus**

32    **facially appearing to benefit from an exemption, YAGI required that individuals**

33    **personally guarantee its loan to Cobalis thereby vitiating the statutory exemption to the**

34    **usury clause of the California *Constitution.***

27

1     **1. The Bankruptcy Code gives Montenegrex standing to object to YAGI's claim.**

2     The plain language of the Bankruptcy Code supports our position. Under 11
3     U.S.C. § 502(a), "[a] claim or interest ... is deemed allowed, unless a party in
4     interest ... objects."
5     *In re G.I. Industries, Inc.* 204 F.3d 1276, 1280 (9th Cir. (Cal.) (2000))
6

7     **2.      The exemption to California's constitutional 10% interest rate limitation on**
8     **commercial loans in excess of $300,000 is lost if the lender requires a *personal guarantee*.**

9     The maximum rate of interest that can be charged under the *California Constitution* is

10    10% per annum. Article 15 § 1. (1).    Payments of upfront fees in connection with a loan is

11    deemed to be interest. (As will be explained, *infra*, YAGI was paid $415,000 in upfront fees.)

12    No person, association, copartnership or **corporation shall by charging any fee,**
13    bonus, commission, discount or other compensation **receive from a borrower**
14    **more than the interest authorized by this section upon any loan** or forbearance
15    of any money, goods or things in action. [Emphasis added.]
16    *California Constitution*, Article 15 § 1. (2)

17

18    Of course anyone with the slightest knowledge of commercial loans recognizes that loans

19    are made in California for far higher rates.    This is because of a series of legislative exemptions

20    that removes the 10% cap.    The most common of these is for a commercial loan of more than

21    $300,000.    *California Corporation Code* § 25118 (b)(1).

22
23    This exemption, however, is *lost* if the borrower requires a personal guaranty by an

24    individual.

25
26    (e) **This section does not apply** to:
27
28    (1) Any evidence of indebtedness issued **or guaranteed (if the guaranty is part**
29    **of the consideration for the indebtedness) by an individual**, a revocable trust
30    having one or more individuals as trustors, or a partnership in which, at the time
31    of issuance, one or more individuals are general partners.    [Emphasis added.]
32    *Id*, (e)(1)
33
34
35    Because YAGI required that Radul and Chaslav Radovich *pledge* their personal shares to

36    guarantee the loan of Cobalis, the usury exemption is *lost* to YAGI.    Pledge agreement annexed

1  to Olsen declaration as Exhibit "6."  Earlier this year, a California district court had to resolve

2  the issue of whether a pledge agreement was a personal guaranty.  It ruled affirmatively.

3

4      Though the Pledge Agreement does not refer to Mr. Wong specifically as a

5  guarantor, nor to the pledge itself as a guaranty, labels in this instance are not

6  dispositive. Both parties intended to have Mr. Wong pledge his personal assets to

7  secure the loan to EA, which effectively placed Mr. Wong in the role of a

8  guarantor. **Because Mr. Wong guaranteed the debt as an individual, the**

9  **transaction falls within § 25118(e)(1), and renders inapplicable the usury**

10  **exemption for commercial loans.** Under California's usury laws, **DAG**

11  **wrongfully charged EA interest on the Note in excess of 10% per annum and,**

12  **as such, is entitled only to the original principal of $500,000.** EA's Motion for

13  Partial Summary Judgment as to the return of all interest paid to DAG is granted.

14  [Emphasis added.]

15  *Development Acquisition Group, LLC v. eaConsulting, Inc.* 2011 WL 837162, 4 (E.D.Cal.

16  (2011))

17

18      Radul and Chaslav Radovich pledged 8.4 million shares on December 20, 2006.  On that

19  date, according to YAHOO Financial, the closing price per share of Cobalis was $0.75.

20  http://finance.yahoo.com/q/hp?s=CLSC.PK&a=11&b=20&c=2006&d=11&e=21&f=2006&g=d

21      There can be no doubt that the pledge of the Radovich was material, $6.3 million at the

22  market value of the shares on the pledge date, and therefore falls within the exception, under §

23  25118(e)(1), to the exemption.

24      **3.    Cobalis is entitled to statutory treble damages for the interest paid to YAGI.**

25      It is undisputed that Cobalis paid to YAGI upfront fees of $385,000; $22,500 and $7,500

26  under the SPA.  These total $415,000.  Under § 3 of California's *Usury Law*, Cobalis is entitled

27  to treble damages of $1,245,000.  *Gilbert v. Wisdom*  2007 WL 2084336, 9  (Cal.App. 4 Dist.

28  (2007)).

29      **4.    The contract for the repayment of the principal amount nominally owing to**

30  **YAGI is void and unenforceable under the California *Constitution*.**

31      As the SPA by its very terms of large upfront fees in addition to an 8% rate of interest are

32  a violation of California law reaching constitutional proportions, the SPA is illegal and void.

33      "Contracts that are contrary to express statutes or to the policy of express

34  statutes ... are illegal contracts. [Citation.] Any such illegality voids the entire

1    contract. [Citation.]" **235 ( *Green v. Mt. Diablo Hospital Dist.* (1989) 207

2    Cal.App.3d 63, 73, 254 Cal.Rptr. 689.)

3    *Mechanical Contractors Assn. v. Greater Bay Area Assn.* 66 Cal.App.4th 672, (1998))

4

5    Usurious contracts are void. *Consolidated Plan of New Jersey, Inc. v. Shanholtz*, 7

6    N.J.Misc 876, 147A 401. Affirmed nom. *Consolidated Plan of New Jersey v. Palkowitz*, 107

7    N.J.L. 517, 153 A. 906; *Richmond v. Conservative Credit System*, 110 N.J.L. 73, 164 A. 563.

8

9    YAGI can therefore take nothing of Cobalis. Its claim is void and a nullity by reason of

10   usury and must be dismissed with prejudice.

11   **5.    YAGI's claim is grounded in an illegal contract under California law and**

12   **thus it is unenforceable under 11 U. S. C. § 502(b)(1).**

13   State law, in this case California, must be used to determine whether a transaction is

14   usurious and therefore void under § 502(b)(1)..  As the SPA documents were executed in

15   California by then residents of California, Cobalis in Orange County and YAGI's office in San

16   Diego County, California law must be used to determine if the SPA is usurious.

17   A claim cannot be allowed if it is unenforceable under nonbankruptcy law.
18   *See* 11 U.S.C. § 502(b)(1).
19   *In re Southern California Plastics, Inc.*165 F.3d 1243, 1247 (9th Cir. (1999))
20
21
22   11 U.S.C. § 502(b)(1). State substantive law is applied to determine the existence
23   and validity of a claim, unless the Bankruptcy Code provides otherwise. *In re*
24   *Sparkman*, 703 F.2d 1097, 1099 (9th Cir.1983); *In re Fantastik, Inc.*, 49 B.R. 510,
25   512–513 (Bankr.D.Nev.1985).
26   *In re Jones* 72 B.R. 25, 26 (Bkrtcy.C.D.Cal. (1987))
27
28   The *California Civil Code* defines unlawfulness:
29
30   That is not lawful which is:
31
32   1. Contrary to an express provision of law;
33   *California Civil Code* § 1667. Unlawfulness defined

34   As explained, *supra*, the *California Constitution* explicitly states that no more than 10%

35   interest can be charged on a loan, absent a statutory exemption, which is lacking herein.

1    The 9th Circuit instructs that once a claim is deemed unenforceable under state law, §

2    502(b)(1) requires that the claim be disallowed.

3    However, an objection based on state usury law falls more appropriately under

4    Section 502(b)(1), **which disallows any claim unenforceable** under applicable

5    nonbankruptcy law. 11 U.S.C. § 502(b)(1); *Household Fin. Corp. v. Swartz (In re*

6    *Swartz)*, 37 B.R. 776, 777-78 (Bankr.D.R.I.1984) (evaluating usury objection

7    under Section 502(b)(1) and applicable state law). [Emphasis added.]

8    *Thrifty Oil Co. v. Bank of America Nat. Trust and Savings Ass'n* 310 F.3d 1188, 1200 (9th Cir.

9    (Cal.) (2002))

10

11    The *Swartz* case relied upon in *Thrifty* emphasizes where, as here, the parties are

12    residents of a state and carrying on business in the state, that state's laws must be used to

13    determine if the transaction is usurious.

14    Because the loan in question was executed in Rhode Island and the parties*778

15    to the agreement are residents of the state or carrying on business within the state,

16    11 U.S.C. § 502(b)(1), which pertains to the allowance of claims, requires that

17    Rhode Island law be used to determine whether this transaction is usurious.

18    *In re Swartz* 37 B.R. 776, 777 -778 (Bkrtcy.R.I. (1984))

19

20    Once determined to be usurious, any principal and interest paid must be returned.

21

22    For the reasons discussed above, and in accordance with the provisions of

23    R.I.GEN.LAWS § 6–26–2 and § 6–26–4, we grant the defendant's motion for

24    summary judgment on the ground that the loan in **question is usurious and void,** and

25    order that Household Finance Corporation **return any principal and interest paid** by

26    Glenn R. Swartz **on account of said loan.** [Emphasis added.]

27    *In re Swartz* , page 779.

28

29    In our case, no principal was paid.   Interest was paid, however, in the amount of

30    $415,000 and its return, trebled, is owed Cobalis by YAGI.

31

32    The substance of the holding of the 9th Circuit in *Thrifty* is widely held.

33

34    The legislative history of § 502(b)(1) indicates that disallowance is required "if

35    the claim is unenforceable as against the debtor for any reason such as **usury,**

36    unconscionability or the failure of consideration other than because it is

37    contingent or unmatured." *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352

38    (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 62 (1978). [Emphasis added.]

31

1   *In re Branch* 2009 WL 2046510, 2 (Bkrtcy.E.D.Tex.,2009)  Accord: *In re Desmond* 331 B.R. 38,
2   41 Bkrtcy.D.N.H. 2005; *In re Young* 313 B.R. 555, 559 (Bkrtcy.W.D.N.Y. (2004))
3
4        Because the interest set forth in the SPA, in the form of upfront fees and the nominal 8%
5   interest rate, *when combined*, exceeds the 10% limitation of the California *Constitution*, and as
6   the exemption for commercial loans of $300,000 and more is vitiated by the pledge required by
7   YAGI from the Radovich, individually, the SPA is usurious and therefore unenforceable.
8
9        The legislative history of Section 502(b)(1) explains the nature of a claim that is
10       "unenforceable against the debtor." Id. Unenforceable claims include those that
11       are **usurious,** unconscionable, or unenforceable because of a failure of
12       consideration. H.R.Rep.No.95-595, 95th Cong., 1st Sess. 352-354 (1977).
13       [Emphasis added.]
14   *Matter of Moses* 9 B.R. 370, 374 (Bkrtcy.Ga. (1981))
15
16       YAGI's entire proof-of-claim must therefore be deemed usurious and void. The upfront
17   fees paid by Cobalis must be returned to Cobalis. These upfront fees are a transaction fee of
18   $385,000, a structuring fee of $22,500 and a due diligence fee of $7,500 for a total of $415,000.
19   This amount, furthermore, should be trebled as explained in ¶ (a) 2. of this brief.
20       **6.    Cobalis is also entitled to punitive damages.**
21       But for YAGI's filing of its proof-of-claim, in bad faith, unlawfully seeking a usurious
22   rate of interest, this case would have been finished years ago. Establishing an escrow account
23   into which the Debtor has deposited more than $1.5 million would have been unnecessary.
24   Hundreds of thousands of dollars in attorney's fees incurred by all parties-in-interest could have
25   been avoided. This Court could have saved endless hearings and hours of deliberative time.
26       YAGI was motivated by an "evil motive" that was to assert absolute priority and deny all
27   other creditors of Cobalis any recovery of their claims. Federal law requires that all claims
28   against a bankruptcy estate be lawful. By presently a claim containing usurious interest, YAGI
29   "callously" violated federal law and the rights of Montenegrex and all other creditors of Cobalis.
30   Given that the expertise of YAGI is money-lending, and its representation by a 600 member law
31   firm, Baker Botts, YAGI more than meets the minimum requirement for punitive damages which
32   include "recklessness" and a criminal indifference to civil obligations.

32

1    Defendants' "conduct is shown to be motivated by **evil motive** or intent, or when
2    it involves reckless or **callous indifference to the federally protected rights of**
3    **others."** *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).
4    In addition, intentional violations of federal law should be sufficient to trigger
5    **consideration of punitive damages.** *Id.* at 51. The intent standard for awarding
6    punitive damages, at a minimum, **requires recklessness in its subjective form,**
7    **referring to a "subjective consciousness" of a risk of injury or illegality," or**
8    **of criminal indifference to civil obligations."** *Kolstad v. American Dental Ass'n,*
9    527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (citing *Smith,* 461
10   U.S. at 37 n. 6, 41).

11   *Lawrence v. City of San Bernardino* 2005 WL 5950105, 13 (C.D.Cal. (2005))

12       The charging of usurious interest in the first place also had an evil motive and reckless
13   indifference to the ability of a borrower to repay its loan.

14       Under California law, to obtain judgment for punitive damages, it is only necessary to
15   show that a defendant acted "maliciously, oppressively or fraudulently." (*Mock v. Michigan*
16   *Millers Mutual Ins. Co.* 4 Cal.App.4th 306, 328 (1992). Charging a usurious rate of interest
17   invokes all 3 criteria but as the use of the word "or" in the last above quotation demonstrates that
18   the criteria are disjunctive and only 1 of the 3 need be present.

19       This case calls out for the imposition of sizeable punitive damages which the Court has
20   the authority to impose.

21       The three criteria for determining the amount of punitive damages that should be
22       awarded are: (1) the reprehensibility of the defendant's actions; (2) the amount of
23       compensatory damages, although there is no fixed ratio for determining whether
24       punitive damages are reasonable in relation to actual damages, and (3) the
25       defendant's financial condition—the wealthier the wrongdoer, the larger the
26       punitive damage award must be to meet the goals of punishment and deterrence.
27       *See Klause v. Thompson (In re Klause),* 181 B.R. 487, 494–95
28       (Bankr.C.D.Cal.1995).

29   *In re Guillory* 285 B.R. 307, 316 (Bkrtcy.C.D.Cal. (2002))

30       Charging interest beyond a California Constitutional limitation; actual damages to
31   Cobalis of $415,000; and YAGI's claim of possessing assets in excess of $1 billion, are merit a
32   large punitive damages award for the public policy purposes of punishment and deterrence.

1    Even if the actual damages of $415,000 were not suffered by Cobalis, punitive damages
2    would still be in order as long as injury is present, according to the 9th Circuit.

3    So long as there has been an actual injury, the plaintiff need not be awarded
4    compensatory damages in order to sustain a punitive damages award. *See*
5    *McLaughlin v. Nat'l Union Fire Ins. Co.*, 23 Cal.App.4th 1132, 1164-65, 29
6    Cal.Rptr.2d 559 (1994). Indeed, an award of nominal damages is sufficient to
7    support a punitive damages award in California. *See Kizer*, 53 Cal.3d at 147, 279
8    Cal.Rptr. 318, 806 P.2d 1353; *see also* Anno., 40 A.L.R.4th § 4 (1985).
9    *Crevier v. Sullinger* 57 Fed.Appx. 319, 321, 2003 WL 249349, 1 (9th Cir. (Cal.) (2003))
10

11    This Court, as guided by the 9th Circuit, can invoke a punitive damage award of from 2 ½
12    % to 5% of the assets of YAGI, *i. e.*, $25 to $50 million. The 9th Circuit views punitive damage
13    award of 5% and under as "not excessive" as they "will not cause [the defendant] to suffer
14    financial ruin." *Transgo, Inc. v. Ajac Transmission Parts Corp.* 768 F.2d 1001, 1025 (9th Cir.
15    (1985)).

16    Punitive damages serve a deterrent effect and a "check on public harm." They are a
17    "'fundamental' part of the statutory scheme." *Walter v. Hughes Communications, Inc.* 682
18    F.Supp.2d 1031, 1041 (N.D.Cal. (2010)). Public victimization is very likely to have occurred
19    already since:

20    *    YAGI had a full service office in La Jolla, CA, for several years as testified to by
21         its representative in that office, Craig Engler, in this Court.
22

23    *    California represents over 10% of total U. S. population. Therefore if YAGI
24         participated in 300 PIPE deals, it is likely that at least 30 occurred in California.

25    *    There are a disproportionately large number of start-ups and nascent public
26         companies in California compared to other states. Thus the presence of more than
27         30 PIPE deals in California is likely.
28

29    *    The characteristics that make the Cobalis loan usurious – advance fees and
30         personal guarantees – are terms commonly requested by lenders making
31         commercial loans for more than $300,000.

32    In addition to the usury wrong, YAGI filed a fraudulent claim in this Court and this also
33    makes YAGI susceptible to punitive damages.

34

> Debtor seeks "actual and punitive damages from the Defendants pursuant to Sections 362(a) and 105 of Title 11 ... **for filing a false a fraudulent proof of claim."** Complaint ¶ 3. Federal courts have inherent and express authority to control the practice before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Bankruptcy courts are further empowered by 11 U.S.C. 105(a), which authorizes them to "issue any order ... necessary or appropriate to carry out the provisions" of Title 11. 11 U.S.C. § 105(a); *In re Dickerson,* 2009 WL 4666457 (Bankr.N.D.N.Y. December 8, 2009). **Bankruptcy courts have inherent authority to sanction parties for improper conduct.** *In re Downs,* 103 F.3d 472, 477 (6th Cir.1996). In order to merit sanctions, the conduct must be done in bad faith. *See In re Green,* 422 B.R. 469, 474–75 (Bankr.S.D.N.Y.2010). [Emphasis added.]

*In re Feinberg* 442 B.R. 215, 225 (Bkrtcy.S.D.N.Y. (2010))

As YAGI has represented to the Court that it is a "billion dollar hedge fund" that has made "over 300 PIPE deals," YAGI's policy of charging enormous upfront fees, *i. e.*, $415,000 on a loan of $3,850,000, can be presumed to be commonplace and directed at the public generally.

Punitive damages of from 2.5% to 5% of YAGI's net asset value is therefore appropriate.

> The awards of $50,000 in punitive damages against both Jacoby and Ajac constitute relatively small percentages of their respective net worths—5% for Jacoby and 2.5% for Ajac. These punitive damage awards are not excessive; they will not cause either of the defendants to suffer financial ruin.

*Transgo, Inc. v. Ajac Transmission Parts Corp.* 768 F.2d 1001, 1025 (9th Cir. (1985))

Cobalis therefore should be paid punitive damages of $25 to $50 million by YAGI.

**7.    The fact that the SA and SPA were subject to New Jersey law is unavailing to YAGI.**

The law is well-established in New Jersey that its usury laws have no application when a "transaction has its sole inception and completion in another state." *Leake v. Bergen* 27 N.J. Eq. 360, 1876 WL 8360 N.J.Ch. 1876.

1    The controlling California law in this District is that the law of another state regarding

2    interest rates will not be applied in California unless that state "has a relationship to the parties or

3    the contract."

4    Under California law, the parties lack power to incorporate Colorado's 44 percent
5    interest rate absent a determination that Colorado, the state of the chosen law, has
6    a relationship to the parties or the contract. [FN7] **469 Subdivision (1) is not self-
7    executing, i.e., while the parties may specifically incorporate Colorado's 44
8    percent interest rate in their contract, that rate will be applied **only if Colorado**
9    **has a relationship to the parties or the contract.** [Emphasis added.]

10    *Mencor Enterprises, Inc. v. Hets Equities Corp.* 190 Cal.App.3d 432, 235 Cal.Rptr. 464

11    (Cal.App. 4 Dist. (1987))

12    Furthermore, a court in California must examine whether the legal principle at stake is

13    fundamental and which state has a materially greater interest in the issue. *Mencor*, page 440. An

14    article of the California Constitution may fairly be said to be "fundamental." The regulation of

15    loans made to California residents is of materially more interest to California than any concern

16    by New Jersey regarding lending activities in the other 49 states.

17    "California has a strong public policy against usury, that is, the charging and
18    receiving interest on the loan or forbearance of money in excess of the rate
19    allowed by law. It has no strong public policy against a particular rate of interest
20    so long as the charging of that rate is permitted by law to the specific lender." (
21    *Gamer v. DuPont Glore Forgan, Inc., supra,* 65 Cal.App.3d 280 at p. 287, 135
22    Cal.Rptr. 230.)

23    *Mencor*, page 469.

24    The 9th Circuit, interpreting *Mencor* has held that the laws of another state in a choice-of-

25    law clause will not be upheld if it results in "an evasion of settled public policy,

26    California's choice of law rule with respect to the interpretation of contracts
27    provides that the contracting parties' selection of another state's law will ordinarily
28    be upheld **"if enforcement of the contract does not result in an evasion of**
29    **settled public policy or California law protective of the rights of its citizens."**
30    *Mencor Enters., Inc. v. Hets Equities Corp.*, 190 Cal.App.3d 432, 435, 235
31    Cal.Rptr. 464, 466 (Cal.App.1987). [Emphasis added.]

32    *REF & Associates v. Texaco Refining and Marketing, Inc.* 1991 WL 126406, 1 ((9th Cir. (Cal.)

33    (1991))

In another well-reasoned case, a California Court examined the relationship of the chosen law state to the parties and then whether the issue relates to a fundamental policy of California.

> "Briefly restated, the proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a *1292 'materially greater interest than the chosen state in the determination of the particular issue....' (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." ( *Nedlloyd, supra,* 3 Cal.4th at p. 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148, fns. omitted.)

*Klussman v. Cross Country Bank* 134 Cal.App.4th 1283, 1291-1292 (Cal.App. 1 Dist. (2005))

Since YAGI concluded the loan to Cobalis from the office of YAGI in La Jolla, California, and as Cobalis is a California resident with no ties to New Jersey, the only relationship of New Jersey is that the main office of YAGI is located there. Even if this should be held to be a sufficient connection, the Constitutional provision at issue reflects settled public policy to protect the rights of California citizens, this Court is constrained to enforce Article 15, § 1 of the California *Constitution*.

**8.     Under New Jersey law, both a fee-shifting agreement and an indemnity agreement requires that the claimant be the *prevailing party*, which YAGI would not be if it its claim is denied or substantially reduced.**

An attorney's fee-shifting agreement to be given effect requires prevailing party status as a matter of New Jersey law.

> In *Teeters, supra,* 387 *N.J.Super.* at 431-33, an OPRA case, we considered the two-part test developed in *Packard–Bamberger* for determining whether a person **was a prevailing party** entitled to attorney's fees. "**The first prong requires that the litigant seeking fees establish that the lawsuit was ... a 'necessary and**

1    **important' factor in obtaining the relief.**" *Teeters, supra,* 387 *N.J.Super.* at 431
2    (quoting *Packard–Bamberger, supra,* 167 *N.J.* at 444). **The second prong**
3    **requires that the relief sought have some basis in law.** *Teeters, supra,* 387
4    *N.J.Super.* at 432. [Emphasis added.]
5    *Smith v. Hudson County Register* 2011 WL 1529730, 3 (N.J.Super.A.D. (2011))
6
7    If YAGI cannot obtain the relief it sought, *i. e.,* payment of its entire proof-of-claim, it
8    will have failed the first prong of the test in *Hudson County Register.*

9    There is no basis in California law for a lender to be able to charge 15% interest when the
10    loan transaction documents are personally guaranteed by individuals. YAGI thus fails the
11    second prong as set forth in *Hudson County Register.*

12    For these reasons YAGI is not entitled to its attorney's fees against Cobalis.
13

14    **9. An indemnity agreement, under New Jersey law, only permits YAGI to seek**
15    **recovery of any liability that YAGI incurred to a *third party* by reason of Cobalis fault,**
16    **missing predicate circumstance.**

17    An indemnification agreement, as contrasted with a fee-shifting agreement that changes
18    the American rule under which each party pays its own litigation expenses, has a very specific
19    meaning under New Jersey law. The indemnification clauses present in this case cannot be read
20    on a standalone basis but must be read within the limitations imposed by New Jersey case law.

21    It is axiomatic, as Judge Debevoise observed in *Travelers Indemnity Co. v.*
22    *Dammann & Co., Inc.,* 592 *F.Supp.*2d 752, 766–67 (D.N.J.2008), *aff'd,* 594 *F.*3d
23    238 (3d Cir.2010), **that an indemnification agreement must be based upon**
24    **"the indemnitee's claim to obtain recovery from the indemnitor for liability**
25    **incurred to a third party."** *See also Feigenbaum v. Guaracini,* 402 *N.J.Super.* 7,
26    18, 952 *A.*2d 511 (App.Div.2008); *Enright v. Lubow,* 202 *N.J.Super.* 58, 85–86,
27    493 *A.*2d 1288 (App.Div.1985), *certif. denied,* 104 *N.J.* 376, 517 *A.*2d 386 (1986);
28    **271 *Fengya v. Fengya,* 156 *N.J.Super.* 340, 345, 383 *A.*2d 1170
29    (App.Div.1978). **Accordingly, the indemnity provision here has no application**
30    **when presented as a shield against claims asserted against the indemnitee by**
31    **the indemnitor.** It is only when the indemnitee is found liable to a third party that
32    the indemnification agreement may be triggered. The judge mistakenly viewed
33    the indemnity provision as having a greater scope than it literally or logically
34    possessed. [Emphasis added.]
35    *Investors Sav. Bank v. Waldo Jersey City, LLC* 418 N.J.Super. 149, 159, 12 A.3d 264, 270 – 271
36    (N.J.Super.A.D. (2011))
37

1    YAGI is not a defendant in any suit from a third party in connection with its loan to

2    Cobalis.

3    Absent any suit by a third party to which YAGI is a defendant, caused by an act of

4    Cobalis, YAGI may not seek indemnification from Cobalis under New Jersey's rule for

5    indemnification agreements.

6    **10.    Cobalis, as the prevailing party successfully opposing YAGI's claim, is**

7    **entitled to recover its attorney's fees from YAGI.**

8    California law requires that in contracts between California residents, when one party to a

9    controversy has an attorney's fee clause in its contract, the other party is entitled to its attorney's

10    fees if it is the prevailing party, even absent an attorney's fee clause.

11    1717. (a) In any action on a contract, where the contract specifically provides that
12    attorney's fees and costs, which are incurred to enforce that contract, shall be
13    awarded either to one of the parties or to the prevailing party, then the party who
14    is determined to be the party prevailing on the contract, whether he or she is the
15    party specified in the contract or not, shall be entitled to reasonable attorney's fees
16    in addition to other costs.

17    *California Civil Code* § 1717(a)

18

19    Determining the amount of fees subject to § 1717(a) reciprocation in a bankruptcy case is

20    rather straight-forward as all fees must be approved by the Court. Upon information and belief,

21    the attorneys in these cases, Paul Couchot; Edward Malpass; Rob Goe; Greg Grantham; and,

22    Blake Lindeman have accrued attorney's fees of approximately $700,000.

23    Cobalis should be requested to submit a detailed accounting so that an Order can be

24    issued requiring YAGI to make Cobalis whole.

25    **(c)    YAGI's repeated shorting of Cobalis shares while the debentures purchased by**
26    **YAGI were still outstanding is a material breach of the SPA and excuses all performance**
27    **by Cobalis.**

28    **1.    It is beyond cavil that YAGI shorted Cobalis shares beginning in 2007 pre-**
29    **petition and continuing thereafter.**

30    Based upon the repeated findings of fact relating to shorting of Cobalis shares by YAGI

31    in the tentative decision of this Court, dated August 11, 2011, this new evidence, uncontroverted

32    by YAGI's attorney during oral argument, warrants the re-opening of the issue of whether

33    Cobalis must be excused from repaying YAGI entirely under controlling New Jersey law.

39

1    **2.     The shorting of Cobalis shares by YAGI was explicitly prohibited in the SPA.**

2         The SPA, annexed to the Olsen declaration as Exhibit "1," in its § 4(l),  explicitly forbids

3    shorting while the debentures are outstanding:

4         (l) Neither the Buyer(s) nor any of its affiliates have an open short position in the

5         Common Stock of the Company, and the **Buyer(s) agrees that it shall not**, and

6         that it will cause its affiliates not to, **engage in any short sale of or hedging**

7         **transactions with respect to the Common Stock** as long as any Convertible

8         Debentures shall remain outstanding.  [Emphasis added.]

9         The above statement, prepared by YAGI, is clear, unambiguous and didactic. The

10   statement is free from any qualification.  The only condition that ends the prohibition against

11   shorting is when there are no longer any Debentures outstanding.  The SPA contains no special

12   definition of the terms "short sale" or "hedging."  In the absence of any special definition, words

13   used in a contract are to be given their common meaning.

14        Despite the undisputed fact that while the Debentures were outstanding, YAGI shorted

15   millions of shares of the common stock of Cobalis, this Court has previously determined that the

16   breach of § 4(l) is excused by an SEC regulation. This determination was in plain error: Cobalis

17   was *unsatisfied* with the limited protection offered by the government regulations and therefore

18   insisted on more stringent, *blanke*t protection against the shorting of its stock by YAGI as long

19   as the debentures, *that were freely convertible into its stock*, were outstanding.  The improper

20   rewriting by this Court of § 4(l) cannot stand and must be interpreted according to its *plain*

21   *meaning*.

22   **3.     This Court may not, as it has done, rewrite § 4(l) to make it more favorable**

23   **for YAGI.**

24        Only if the statement is rewritten by the Court to include what the parties left out – a

25   reference to a supposedly controlled SEC regulation—does this Court's determination make

26   sense.

27        Section 4(l) provides great comfort to Cobalis.  Without a prohibition against short sales

28   by private agreement, Cobalis cannot rely upon SEC regulations for protection.  As the Court

29   pointed out, YAGI under the law is free to short Cobalis shares, without limitation, as long as it

1    holds Cobalis debentures. The short of millions of shares, in a thinly traded stock, can drive the

2    price from $1.25 a share to $0.01 a share. This *actually occurred* in the period from May 2007

3    to December 2007 based solely on the shorting of Cobalis shares by YAGI. While this was not

4    unlawful, as the Court properly determined, it was violative of § 4(l). The very protection that

5    Cobalis had bargained for was erased when this Court read into § 4(l) words that do not appear

6    therein. The Court improperly rewrote § 4(l) as follows:

7        (l) Neither the Buyer(s) nor any of its affiliates have an open short position in the

8        Common Stock of the Company, and the Buyer(s) agrees that it shall not, and that

9        it will cause its affiliates not to, engage in any short sale of or hedging

10        transactions **[in violation of regulations of the Security and Exchange**

11        **Commission]** with respect to the Common Stock as long as any Convertible

12        Debentures shall remain outstanding. [Emphasis added.]

13    Based on the Court's rewriting of § 4(l), the Court ruled that YAGI did not violate this

14    provision when it sold shares of Cobalis without having the share certificate in hand--that being

15    the classic, centuries-old common law definition of a short sale-- because YAGI had the ability

16    to obtain share certificates by exercising its right to convert debentures into shares. In other

17    words, this Court reasoned that because YAGI did not violate a statute of the United States,

18    YAGI did not violate § 4(l) of the SPA.

19    No Court can rewrite the parties' agreement for them under the law of New Jersey that

20    this Court is required to apply, by the terms of the SPA, to its interpretation of the SPA:

21

22        Nevertheless, the rationale for interpreting contractual terms in accord with the

23        plain meaning of the language expressed is multifarious, resting in part upon what

24        is viewed as the appropriate role of the courts in the interpretive process: "[T]his

25        Court long ago emphasized that '[t]he parties [have] the right to make their own

26        contract, **and it is not the function of this Court to re-write it, or to give it a**

27        **construction in conflict with ... the <u>accepted and plain meaning</u> of the**

28        **language used.'** *Hagarty v. William Akers, Jr. Co.*, 342 *Pa.* 236, 20 *A.*2d 317

29        (1941)." *Felte v. White*, 451 *Pa.* at 144, 302 *A.*2d at 351. " 'It is not the province

30        of the court to alter a contract by construction **or to make a new contract for the**

31        **parties**; its duty is confined to the interpretation of the one which they have made

32        for themselves, without regard to its wisdom or folly.' [13 *C.J.* § 485, p. 524]"

33        *Moore v. Stevens Coal Co.*, 315 *Pa.* 564, 568, 173 *A.* 661, 662 (1934). In 17A

34        *C.J.S. Contracts* § 296(3), appears the following:

**The court may not rewrite the contract** for the purpose of accomplishing that which, in its opinion, may appear proper, or, on general principles of abstract justice ... make for [the parties] a better contract than they chose, or saw fit, to make for themselves, or remake a contract, under the guise of construction, because it later appears that a different agreement should have been consummated in the first instance....

*6 (Footnotes omitted.)

*BASF Corp. v. Lyondell Chemical Co.* L 5288645, 5 -6 (N.J.Super.A.D. (2010))

Unsurprisingly the case law of California is no different.

Under California law, we cannot make a better agreement for the parties if in our view their contract seems imprudent or to operate harshly. (See *Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co.* (1964) 228 Cal.App.2d 810, 815 ["**The courts cannot make better agreements for parties than they themselves have been satisfied to enter** into or rewrite contracts because they operate harshly or inequitably. It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. [Emphasis added.]

*Smith v. U.S. Bank Nat. Ass'n* 2010 WL 3659620, 6 (Cal.App. 2 Dist. (2010))

   4.    **It is only when a party successfully argues *ambiguity* that a Court may look beyond the plain meaning of contractual terms.**

   YAGI has not argued that § 4(l) is ambiguous. Nor has the Court found ambiguity in § 4(l). It is only when a court finds that there is *ambiguity* in the meaning of a contractual term that a court may go beyond the parties intent as revealed by their words in their contract.

   Where there is **ambiguity as to the meaning of a contractual term,** however, the Supreme Court has stated that "courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation [.]" *Cnty. of Morris v. Fauver,* 153 *N.J.* 80, 103, 707 A.2d 958 (1998). [Emphasis added.]

*Union Montclair Housing Associates v. Township of Montclair* 2011 WL 1225851, 1 (N.J.Super.A.D. (2011))

   Section 4(l)'s phrase "shall not engage in any short sale of or hedging with respect to the Common Stock as long as any Convertible Debentures shall remain outstanding" is

1  unambiguous. Thus there is no trigger for this Court to invoke the powers granted to it under

2  *Union Montclair.*

3       Another New Jersey court, relying upon conforming precedent, ruled that when terms are

4  clear and unambiguous, "there is no room for construction."

5       **In our examination, if we find "the terms ... are clear and unambiguous,**
6       **there is no room for construction and the court must enforce those terms as**
7       **written,"** *Watson v. City of E. Orange,* 175 *N.J.* 442, 447, 815 *A.2d* 956 (2003),
8       giving them "their plain, ordinary meaning." *Pizzullo v. New Jersey Mfrs. Ins.*
9       *Co.,* 196 *N.J.* 251, 270, 952 *A.2d* 1077 (2008). *See also Zacarias v. Allstate Ins.*
10      *Co.,* 168 *N.J.* 590, 595, 775 *A.2d* 1262 (2001). [Emphasis added.]

11 *Barr v. Barr* 418 N.J.Super. 18, 32, (N.J.Super.A.D. (2011))

12

13      **5.      This Court has never found ambiguity in § 4(l) of the SPA.**

14

15      This Court has never made any finding of ambiguity regarding § 4(l). No can ambiguity

16 be found as the statement is clear and unambiguous.

17      Excising a paragraph from an agreement between the parties, or reforming same by bring

18 in extrinsic matter, so as to make a better contract for YAGI, is beyond the power of this Court

19 when applying New Jersey law.

20      We recognize that it is not the function of the court to make a better contract for
21      the parties, or to supply terms that have not been agreed upon. *Schenck v. HJI*
22      *Associates,* 295 *N.J.Super.* 445, 450, 685 *A.2d* 481 (App.Div.), *certif. denied,* 149
23      *N.J.* 35, 692 *A.2d* 48 (1997). If the terms of a contract are clear, we must enforce
24      the contract as written **and not make a better contract for either party.**
25      **[Emphasis added.]**

26 *Graziano v. Grant* 326 N.J.Super. 328, 342(N.J.Super.A.D. (1999))

27

28      This Court has ignored *Graziano* by giving § 4(l) a *contorted* meaning making it

29 impossible for YAGI to engage in what this Court would consider a short sale until every

30 debenture is completely redeemed. Until that occurs, YAGI can always acquire shares of

31 Cobalis by converting a debenture into shares. Under this Court's interpretation of § 4(l), there is

32 virtually no circumstance in which the paragraph, that is a covenant by the Seller, provides *any*

33 protection to Cobalis. It becomes a completely *illusory* covenant under the Court's interpretation

34 with *no meaning whatsoever,* under the Court's reading of same. Removing all meaning from a

35 plain, comprehensible contractual term that is grounded in centuries old common law, by

43

reference to a recent *regulation* that is not referred to anywhere in the SPA, is something no
court can do. An excellent analysis of the interrelationship of and limitation on the modification
of common-law rules by regulation is found in a state law case from Connecticut:

> "In determining whether or not a statute abrogates or modifies a common-law
> rule the construction must be strict, and the operation of a statute **in derogation of
> the common law is to be limited to matters *clearly* brought within its scope."**
> (Emphasis added; internal quotation marks omitted..) *Potter v. Chicago
> Pneumatic Tool Co.,* 241 Conn. 199, 230, 694 A.2d 1319 (1997). That statement
> is equally applicable to an administrative regulation. See *Spero v. Zoning Board
> of Appeals,* 217 Conn. 435, 441, 586 A.2d 590 (1991). There is no indication that
> *566 § 16–11–102(a) was intended to change the common law concerning the
> existence of the duty owed a trespasser. Absent a clear intent, the regulation
> should not be so construed, and we decline to do so.

*Maffucci v. Royal Park Ltd. Partnership* 243 Conn. 552, 565-566 (1998)

New Jersey's highest court has gone even further by holding that no statute can be read to
restrict the common law unless by its words it fairly expresses an intent to do so.

> Moreover, a statute in derogation of the common law should be strictly
> construed. *Velazquez, supra,* 172 *N.J.* at 257, 798 *A.*2d 51. Doubt about the
> meaning of such statutes should be resolved in favor of the effect which makes
> the least rather than the most change in the common law. The rule has been
> declared by the United States Supreme Court, as follows: "No statute is to be
> construed as altering the common law, farther than its words import. **It is not to
> be construed as making any innovation upon the common law which it does
> not fairly express."**
>
> [ *Oswin v. Shaw,* 129 *N.J.* 290, 310, 609 *A.*2d 415 (1992) (quoting 3 Norman J.
> Singer, *Sutherland Statutory Construction* § 61.01, at 77 (4th ed. 1986) (footnote
> omitted) (quoting *Shaw v. R.R. Co.,* 101 U.S. 557, 565, 25 *L.Ed.* 892, 894
> (1880))).] [Emphasis added.]

*Marshall v. Klebanov* 188 N.J. 23, 37(N.J. (2006))

**6.    Under the unambiguous terms of § 4(l) this Court is constrained to determine
that based upon its prior findings that YAGI engaged in short selling of Cobalis shares
from April 2007 onwards that YAGI violated the parties agreement so as to excuse
performance by Cobalis.**

44

1     As it is undisputed that YAGI engaged in short selling–the tentative ruling refers to

2     factual findings of short selling by name at least a half-dozen times—a determination is required

3     that YAGI violated the plain, unambiguous meaning of § 4(l) and thereby defaulted under the

4     terms of the SPA.

5     Section 4(l) cannot be rendered *superfluous*.  It is unnecessary under any contract to state

6     that the parties thereto will obey the law.  This is the only meaning that this Court has ever given

7     to § 4(l).  That is not enough.   The clear purpose of § 4(l) is to provide Cobalis with additional

8     protection *beyond* what the law provides.

9     This Court has taken away that protection by ruling that YAGI can short Cobalis stock as

10    long as it conforms with *CFR* § 242.200(g)(1).  That ruling would be appropriate only if the SEC

11    were the plaintiff.

12    **7.     There is nothing to prevent parties from adding provisions to an agreement**

13    **that are more stringent than statutory protections.**

14

15    Another New Jersey ruling requires a ruling of this Court that while the SEC rule clearly

16    permits the holder of a convertible security to sell the underlying stock short before the

17    conversion has produced a physical stock certificate, the SEC rule does not forbid parties to an

18    agreement for the sale of convertible debentures to agree, as occurred in § 4(l), that no shorting

19    whatsoever will occur for so long as the said debentures are outstanding.

20

21    "Where a statute alters the common law, the most circumscribed reading of it that

22    achieves its purpose is the one that should be adopted." *456 Id.* at 257, 798 *A.*2d

23    51.

24    *De Tarquino v. City of Jersey City* 352 N.J.Super. 450, 455-456 (N.J.Super.A.D. (2002))

25

26

27    The common law, as it affects commercial transactions, cannot be rewritten by regulation

28    in derogation of the common law other than "matters *clearly* brought within its scope."

29    [Emphasis in original]. *Maffucci*. There is no intent in *CFR* § 242.200(g)(1) to limit the ability

30    of YAGI to waive its unrestricted right to short the stock of Cobalis. YAGI clearly waived that

31    right, unconditionally and unqualifiedly in § 4(l). This Court cannot, as it has done, invalidate

32    YAGI's waiver on the sole ground that the conduct that what YAGI forswore was not unlawful

45

1    Based on the existing findings by this Court that YAGI engaged in repeated short selling

2    of Cobalis shares, that is explicitly prohibited by section 4(l), the Order for which

3    reconsideration is sought must be revised so as to find YAGI in default of § 4(l) of the SPA and

4    the relevant cause of action in the dismissed complaint must be reinstated and YAGI required to

5    answer.

6    **8.    Because the shorting by YAGI contributed to the driving down of the price**

7    **of Cobalis stock from $1.25 in May 2007 to $0.01 in December 2007, Cobalis was denied its**

8    **"reasonable expectations" and the enjoyment of the "fruits of its contract" with YAGI.**

9    **Under binding New Jersey law, this is sufficient to excuse Cobalis performance.**

10

11    Under the terms of the SPA, not a penny of the money lent to Cobalis in December 2006.

12    nor a penny of interest thereon, was due until December of 2008.    Thus Cobalis had the

13    expectation of being able to conduct its business for two years without any interference by

14    YAGI.  It is undisputed that Cobalis completely performed its obligations under the transaction

15    documents by, *inter alia*, issuing all security documents when due and properly executed.

16    As Cobalis was a development company in 2006 and 2007, its only revenues could come

17    from selling debentures and shares.    Therefore the price of its stock was of paramount

18    importance to Cobalis.  That is why Cobalis insisted in § 4(l) of the SPA which is a blanket

19    prohibition against short sale transactions by YAGI of Cobalis stock for as long as the

20    debentures were outstanding.

21    The terms of the SPA were made known to the public—*including the provision that YAGI*

22    *would not engage in short sale transactions of Cobalis stock.*  SPA, § 4(l).  The SPA was filed

23    with the SEC on 12/27/2006.  Thus if shorting of Cobalis stock occurred subsequently, the public

24    would believe it was by other than YAGI.  Any massive shorting that occurred would carry with

25    it the innuendo of an intrinsic fault in Cobalis.

26    Ignoring § 4(l), YAGI, beginning in April 2007, began shorting shares of Cobalis stock

27    ultimately driving down the price per share to $0.01 in December 2007. This violated the

28    covenant of good faith and fair dealing especially as YAGI had covenanted in § 4(l) not to sell

29    shares of Cobalis stock short for as long as the debentures were outstanding.  The penalty in New

30    Jersey for a violation of this covenant is that the non-breaching party is to be excused from

31    performance.

46

1    New Jersey's highest court instructs that a plaintiff claiming a breach of the covenant of
2    good faith and fair dealing has a light burden. The injured party only need show that the acts of
3    the other party destroyed its reasonable expectations and right to receive the fruits of the
4    contract.

5           Because its conduct destroyed Sons of Thunder's **reasonable expectations**
6           **and right to receive the fruits of the contract,** Borden also breached the implied
7           covenant of good faith found in New Jersey's common law. [Emphasis added.]
8    *Sons of Thunder, Inc. v. Borden, Inc.* 148 N.J. 396, 425, 690 A.2d 575, 589 (N.J. (1997))
9

10   In a subsequent case, the high court reduced even further the burden on the injured party by
11   holding that:

12          Moreover, a plaintiff may get relief if it relies to its detriment on a defendant's
13          intentional misleading assertions. *Bak-A-Lum, supra,* 69 N.J. at 129-30, 351 A.2d
14          349.
15   *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates* 182 N.J. 210, 226,
16   864 A.2d 387, 396 (N.J. 2005)
17
18          In *Bak-A-Lum,* the high court went so far as to find a breach of the covenant even when
19   there was no literal violation of the contract.
20

21          However, we have been at pains recently to point out that '(i)n every contract
22          there is an implied covenant that 'neither party shall do anything which will have
23          the effect of destroying or injuring the right of the other party to receive the fruits
24          of the contract; in other words, in every contract there exists an implied covenant
25          of good *130 fatih and fair dealing.'' Association Group Life, Inc. v. Catholic
26          War Vets. of U.S., 61 N.J. 150, 153, 293 A.2d 382, 384 (1972). See also Palisades
27          Properties, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965). In the first
28          cited case we distinguished **between an absence of literal violation of a**
29          **contract** and the breach of the implied covenant of good faith therein which could
30          give rise to the sanction of damages. 61 N.J. at 153-154, 293 A.2d 382.
31   *Bak-A-Lum Corp. of America v. Alcoa Bldg. Products, Inc.* 69 N.J. 123, 129-130 (N.J. 1976)
32
33          The high court built upon *Bak-a-Lum* in 2005 in a case where one party *withheld vital*
34   *information* to the other party without regard to the harm caused its contract partner.
35

36          Like *Bak-A-Lum, supra,* we are faced with a defendant whose actions do not
37          literally violate any express term of the contract. Yet, as in *Bak-A-Lum, supra,*

1        defendant here withheld vital information from plaintiff with the purpose of
2        exploiting the terms of the contract without regard to the harm caused to plaintiff.
3        As in *Bak-A-Lum, supra,* plaintiff here relied on the presumed good faith of
4        defendant to its detriment.
5    *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates* 182 N.J. 210, 227,
6    864 A.2d 387, 397 (N.J. 2005)
7

8        In the most recent pronouncement, the covenant is most liberally expressed as prohibiting
9    any act that injures the right of the other party to receive the fruits of the contract.

10

11            "[E]very contract in New Jersey contains an implied covenant of good faith
12        and fair dealing." *Sons of Thunder v. Borden, Inc.,* 148 N.J. 396, 420, 690 A.2d
13        575 (1997). Specifically, **"neither party shall do anything which will have the**
14        **effect of destroying or injuring the right of the other party to receive the**
15        **fruits of the contract...."** *Palisades Props., Inc. v. Brunetti,* 44 N.J. 117, 130, 207
16        A.2d 522 (1965) (quoting 5 *Williston on Contracts* § 670, pp. 159-160 (3d
17        ed.1961)). **However, when one party commits a material breach of the**
18        **contract, the non-breaching party is excused from future performance.** *Nolan*
19        *v. Lee Ho,* 120 N.J. 465, 472, 577 A.2d 143 (1990). [Emphasis added.]
20    *Friedman Siegelbaum, LLP v. Pribish* 2009 WL 910326, 9 (N.J.Super.A.D. (2009)
21

22        When these cases are applied to our fact pattern it becomes clear that YAGI can expect
23    no performance by Cobalis.  YAGI, in § 4(l) stated it would not engage in short selling or
24    hedging transactions of Cobalis stock for as long as the debentures were outstanding.  This was
25    not YAGI's intention.  Almost immediately, in April 2007, YAGI began selling Cobalis shares
26    short.  By December 2007 YAGI had sold millions of shares short and reducing the per share
27    price to $0.01.  YAGI, which had promised not to sell Cobalis shares short, destroyed the
28    company's ability to raise funding by selling Cobalis shares short.

29        (It must be emphasized that Montenegrex herein only complains of contractual breaches.
30    No effort is made to rely on any private-right-of-action to enforce federal securities laws.)

31        As YAGI has breached the covenant of good faith and fair dealing, under controlling
32    New Jersey law, the performance of Cobalis must be excused.

33    **9.        Montenegrex should not be bound by the law of the case doctrine.**

48

1     Montenegrex realizes that Cobalis raised the issue of breach of its agreements by YAGI

2     of its SPA when YAGI shorted the stock of Cobalis, and that this Court dismissed Cobalis cause

3     of action, with prejudice.   Montenegrex, of course, was not a party to the Complaint of Cobalis

4     and is not bound by *res judicata* in that adversary proceeding.   Montenegrex may challenge the

5     claim of YAGI as a contested matter. The adjudication of a disputed claim, such as the

6     Department's, however, is handled as a contested matter. *In re Ayre*   360 B.R. 880, 887

7     (C.D.Ill.,2007)

8     Nor should Montenegrex be bound under the law of the case doctrine as it would be unfair to

9     do so because of the substantial evidence set forth by this Court in its tentative decision of

10    August 11, 2011, finding that YAGI sold short shares of Cobalis stock on multiple occasions.

11    Based on this new evidence, it would be unjust not to consider voiding the agreements between

12    YAGI and Cobalis for breaching the no-shorting clause.

13

14         Balanced against these valid concerns, however, are equally strong
15         considerations that occasionally pull in the opposite direction. We have held that
16         the "[l]aw of the case should not be applied woodenly in a way inconsistent with
17         substantial justice." *United States v. Miller*, 822 F.2d 828, 832 (9th Cir.1987); *see*
18         *also Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944
19         F.2d 597, 602 (9th Cir.1991) ("[T]he law of the case is an equitable doctrine that
20         should not be applied if it would be unfair."); *Loumar, Inc. v. Smith*, 698 F.2d
21         759, 762 (5th Cir.1983) ("The law of the case doctrine is not ... a barrier to
22         correction of judicial error. It is a rule of convenience and utility and yields to
23         adequate reason...."). Interests of efficiency and finality clash with the
24         responsibility of the court to not issue judgments known to be wrong on the facts
25         or law.

26

27         [21] ☑ As a compromise between these sometimes countervailing interests,
28         we have identified three exceptional circumstances in which, on balance, we
29         deem the concerns of finality and efficiency outweighed. Law of the case should
30         not operate as a constraint on judicial review where "(1) the decision is clearly
31         erroneous and its enforcement would work a manifest injustice,[FN17] (2)
32         intervening controlling authority*1187* makes reconsideration appropriate, or (3)
33         substantially different evidence was adduced at a subsequent trial." *Jeffries V*, 114
34         F.3d at 1489 (internal quotation marks and footnote omitted). Here, Gonzalez
35         argues that the first exception applies. We agree.

36    *Gonzalez v. Arizona*, 624 F.3d 1162, 1186-1187 (9th Cir. 2010)

49

1    There can be no question that the no-shorting provision of the SPA was a material

2    protection to Cobalis. This Court found that shorting occurred on multiple occasions. "A material

3    breach of a contract excuses the other party from further performance." *McManus v. Saleeby*

4    2011 WL 1661074, 3 (N.J.Super.A.D.,2011) citing to *Nolan v. Lee Ho,* 120 *N.J.* 465, 472 (1990).

5    Montenegrex therefore argues that under the New Jersey law to which the parties agreed to

6    be bound, YAGI may take nothing of Cobalis.

7    **10.    The extensive shorting of Cobalis shares by YAGI when the convertible**

8    **debentures were outstanding, violates § 4(l) and requires that Cobalis be excused from all**

9    **repayment to YAGI, under binding New Jersey law.**

10    Under controlling New Jersey law a material breach excuses the other party from

11    rendering further contractual performance.

12    Furthermore, "a material breach by either party to a bilateral contract excuses

13    the other party from rendering any further contractual performance." *Magnet*

14    *Resources, Inc. v. Summit MRI, Inc.,* 318 *N.J.Super.* 275, 285 (App.Div..1998).

15    *Deutsch v. Binet* 2011 WL 2320899, 8 (N.J.Super.A.D. (2011))

16

17    By selling millions of shares of YAGI common stock short, with the result that the per share

18    price declined from $1.25 per share to $0.02 per share during the May-December 2007 year,

19    YAGI materially breached § 4(l) of the SPA in which it promised not to sell a single share short

20    as long as its debentures were outstanding.

21

| | Date | Certificate # | $ Amount | # of Shares | Price Per Share |
|---|---|---|---|---|---|
| 22 | | | | | |
| 23 | 3/23/07 | 9448 | $25,000 | 33,025 | $0.76 |
| 24 | 4/10/07 | 9466 | 25,000 | 36,539 | 0.68 |
| 25 | 4/12/07 | 9467 | 500,000 | 730,780 | 0.68 |
| 26 | 4/24/07 | 9499 | 999,999 | 1,333,333 | 0.75 |
| 27 | 7/13/07 | 9544 | 170,000 | 1,524,664 | 0.11 |
| 28 | 7/19/07 | | 195,000 | 1,748,879 | 0.11 |
| 29 | 9/27/07 | | 79,809 | 1,505,823 | 0.05 |

50

| 1 | 9/28/07 | | 32,191 | 607,385 | 0.05 |
| 2 | 10/16/07 | 9587 | 67,000 | 1,607,143 | 0.04 |
| 3 | 3/12/08 | 9635 | 52,500 | 2,375,566 | 0.02 |
| 4 | 4/3/08 | 9637 | 60,000 | 2,343,750 | 0.03 |
| 5 | 4/18/08 | 9641 | 22,049 | 1,055,000 | 0.02 |
| 6 | **TOTAL** | | **$2,154,748** | **13,901,887** | **0.15** |

7

8   The loss in market value to Cobalis was well over $50 million and dwarfs the amount of
9   YAGI's loan to Cobalis of $3,850,000.

10   The essence of the contract between YAGI and Cobalis was to fund the future growth of
11   Cobalis by making funds available to conduct medical research to advance the marketing of Pre-
12   Histin®, the only product of Cobalis. As Cobalis was a development company, with no
13   marketplace sales, its only means of raising revenue was through the sale of its stock to the
14   public. By driving down the price of that stock to $0.01 at the end of December 2007, YAGI
15   destroyed that ability. Thus Cobalis was completely deprived of the benefit it expected, *i. e.*, to
16   have the use of the $3.85 million loan through December 2008 to market its product and collect
17   sales revenues.

18
19   YAGI has done nothing to ameliorate the situation for Cobalis. Relieving Cobalis of the
20   need to repay YAGI is an award contemplated by the courts of New Jersey in this situation.

21
22       A material breach is one that " 'goes to the essence of a contract,' " *Goldman*
23       *S. Brunswick Partners v. Stern,* 265 *N.J.Super.* 489, 494 (App.Div.1993) (quoting
24       *Ross Sys. v. Linden Dari Delite, Inc.,* 35 *N.J.* 329, 341 (1961)), and should be
25       evaluated under the following "flexible criteria":
26
27       "(a) the extent to which the injured party will be deprived of the benefit which he
28       reasonably expected;
29
30       (b) the extent to which the injured party can be adequately compensated for the
31       part of that benefit of which he will be deprived;
32

51

1        (c) the extent to which the party failing to perform or to offer to perform will
2        suffer forfeiture;
3
4        (d) the likelihood that the party failing to perform or to offer to perform will cure
5        his failure, taking account of all the circumstances including any reasonable
6        assurances;
7
8        (e) the extent to which the behavior of the party failing to perform or to offer to
9        perform comports with standards of good faith and fair dealing."
10
11        [ *Neptune Research & Dev., Inc. v. Teknics Indus. Sys., Inc.*, 235 N.J.Super. 522,
12        532 (App.Div.1989) (quoting *Restatement (Second) of Contracts* § 241 (1981)).]
13  *Deutsch v. Binet* 2011 WL 2320899, 8 (N.J.Super.A.D. (2011))
14

15        Applying the *Deutsch* standards to the facts of this case leads to the conclusion that
16  Cobalis must be excused from performance:

17        *      Cobalis was totally deprived of the opportunity to market its product to consumers
18  as Cobalis could not raise the additional funds required for national advertising and distribution
19  through the sale of additional shares of its stock when YAGI, by its short selling, drove the price
20  of the stock to a penny.

21        *      The loss of tens of millions in sales revenues cannot be compensated by YAGI for
22  any less than the cancellation of its loan of $3,850,000.

23        *      YAGI will suffer forfeiture of only $3,850,000; the loss of Cobalis is much more.
24  It shares had a market value of over $50 million in May 2007, in December 2007, due to the
25  short selling of millions of shares by YAGI, the market value was under $5 million.

26        *      YAGI has made no offer to cure and is unlikely to do so.

27        *      YAGI's course of conduct was the epitome of bad faith; promising not to short
28  Cobalis shares and then shorting millions of Cobalis shares.

29        For all of these reasons, any repayment obligation of Cobalis to YAGI should be
30  nullified.

31  **(d)    YAGI violated the automatic stay when it converted debt into shares of Cobalis**
32  **stock that were the Debtor's property, without leave of the Court.**
33

1    **1.    There is no issue that YAGI converted debentures after filing its Chapter 7**
2    **Petition on August 1, 2007.**
3
4    It is indisputable that after the Chapter 7 case was filed by YAGI on August 1, 2007, and
5    its subsequent conversion in November, YAGI on multiple occasions converted its debentures
6    for stock in Cobalis that was then in the possession of a transfer agent, acting in effect as an
7    escrow agent.

| Date | Certificate | $ amount | # of shares | Price per share |
|------|-------------|----------|-------------|-----------------|
| 7/13/07 | 9544 | $170,000 | 1,524,664 | 0.11 |
| 7/19/07 | | 195,000 | 1,748,879 | 0.11 |
| 9/27/07 | | 79,809 | 1,505,823 | 0.05 |
| 9/28/07 | | 32,191 | 607,385 | 0.05 |
| 10/16/07 | 9587 | 67,000 | 1,607,143 | 0.04 |
| 3/12/08 | 9635 | 52,500 | 2,375,566 | 0.02 |
| 4/3/08 | 9637 | 60,000 | 2,343,750 | 0.03 |
| 4/18/08 | 9641 | 22,049 | 1,055,000 | 0.02 |
| TOTAL | | | **12,768,210** | |

18    The shares, although being held not by Debtor but by a transfer agent, were not the
19    property of the agent.  Nor could they have been the property of YAGI without violating the
20    4.99% limitation rule as explained by this Court during oral argument on August 11, 2011.
21
22    Thus the shares were property of either the Debtor's estate or the Debtor.  As will be seen
23    this makes no difference inasmuch as the automatic stay is concerned.
24    **2.    If the shares were property of the *Debtor's estate*, they were subject to the**
25    **automatic stay.**
26    Notwithstanding that the shares were arguably subject to the conditional pre-petition lien
27    of YAGI, they nonetheless were property of the Debtor's estate.
28

1    The United States Supreme Court has held in *United States v. Whiting Pools,*
2    *Inc.,*[FN29] however, that by virtue of §§ 541 and 542(a), **even property that is**
3    **subject to a pre-petition lien and is not in the possession of the debtor**
4    **nonetheless constitutes** <u>property of the estate. [Emphasis added.]</u>
5    FN29. 462 U.S. 198, 209, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). See also *In re*
6    *Yeary,* 55 F.3d 504, 508-09 (10th Cir.1995)
7    *In re Gindi* 2010 WL 1253158, 5 (10th Cir.BAP 2010)
8
9    Property being held in escrow that could be returned to the Debtor is considered property
10   of the estate.

11       Similarly, the debtor's interest in the escrow funds in the Merrill Lynch
12   account are also **property of the estate.** *See, e.g., In re Yeary,* 55 F.3d 504, 508–
13   09 (10th Cir.1995); *Matter of Missionary Baptist Foundation of America, Inc.,*
14   792 F.2d 502, 504 (5th Cir.1986).   [Emphasis added.]
15   *In re 3036 Richmond, Inc.* 2001 WL 36275467, 6 (Bkrtcy.E.D.Pa. (2001))
16
17
18       **3. If the shares were property of the *Debtor*, they were subject to the automatic stay.**
19
20       Any interference with the property of the debtor or the debtor's estate is violative of 11
21   U. S. C. § 362(a)(5):

22       (5) any act to create, perfect, or enforce against **property of the debtor** any lien
23       to the extent that such lien secures a claim that arose before the commencement of
24       the case under this title;
25       Thus when YAGI, post-petition, converted its debt into these escrowed shares to enforce
26   its pre-petition lien, it interfered with the property of the Debtor and violated § 362 (a) (5).
27       Cobalis therefore has grounds to demand the return of the **12,768,210** shares that were
28   given to YAGI by the transfer agent in order to restore the *status quo ante*.
29       As to the cost to YAGI of purchasing such a large amount of shares in a thinly traded
30   stock such as Cobalis is likely to exceed $10 million, any payment by Cobalis to YAGI must
31   await the return to Cobalis of its shares from YAGI.
32
33   **(e)    <u>Cobalis and all of its remaining creditors would be best served by a dismissal of the</u>**
34   **<u>cases.</u>**
35

1    As conversion of the cases to Chapter 7 leaves all creditors with no hope of recovery of
2    their claims, a dismissal lets the creditors live for another day to seek payment from a now
3    prospering Cobalis.

4              As for section 305, the Ninth Circuit BAP has held: "the test under section
5         305(a) is not whether dismissal would give rise to a substantial prejudice to the
6         debtor. Nor is the test whether a balancing process favors dismissal. Rather, **the
7         test is whether both the debtor and the creditors would be 'better served' by
8         a dismissal.**" *Eastman v. Eastman (In re Eastman)*, 188 B.R. 621, 625 (9th
9         Cir.BAP 1995). [Emphasis added.]
10   *In re Cytodyn of New Mexico, Inc.* 374 B.R. 733, 738(Bkrtcy.C.D.Cal. (2007))

11   The dismissal of both cases will enable all remaining creditors to seek pre-petition
12   interest, at state interest rates that are considerably higher than the current 0.33% federal
13   judgment rate, that was stopped by the filing of the initial case on August 1, 2007. This is over 4
14   years interest. As Cobalis is currently profitable, and by the relief sought in this motion will
15   have a relatively small total debt, Cobalis will have the ability to settle all legitimate claims.

16   If the cases would be converted to Chapter 7, the remaining creditors and all equity
17   interest holders would see nothing.

18   This disposition is in the best interest of everyone:

19         *    The employees of Cobalis; others who earn their living printing the
20   packaging for Pre-Histin® and formulating its tablets; and those in the distribution chain, will
21   continue in their jobs—a very important consideration at this moment in our nation's history
22   when unemployment is at 9.2%.

23         *    Consumers suffering from allergies will continue to be able to obtain
24   relief.

25         *    The shareholders who have invested their savings in Cobalis will still have
26   a chance of an economic return.

27         *    A conversion to Chapter 7, without any remaining assets to be
28   administered, is therefore in no one's interest.

29   The criteria set forth in the *Cytodyn* case clearly favor dismissal.

30

31

32

1   executed by YAGI and Cobalis thereby leaving the Debtor with no equity in any of its pre-

2   petition assets.

3       Montenegrex also seeks, with the consent of Cobalis, a consequential Order granting

4   relief from the automatic stay under 11 U. S. C. § 362(d)(2)(A)(B) and enforcing the transfer of

5   said assets to ownership by Montenegrex conditional upon a leaseback of these same assets to

6   the Debtor on such terms that are agreeable to the Debtor for the purpose of a successful

7   reorganization and reducing Montenegrex claim by the present value of these assets which is

8   $1,138,445. Montenegrex should also be ordered to be paid $361,555. from the escrow account

9   bringing the value of its total payment to $1,500,000, the original value of all of Cobalis assets as

10  determined by this Court.

11      A further Order, with the consent of Cobalis, should direct the escrow agent to pay

12  Montenegrex, as the permitted lienor of Cobalis, the remainder of its judgment inclusive of post-

13  judgment interest, which with interest, amounts to $505,951.

14      Montenegrex, as a party-in-interest seeks a declaratory judgment that YAGI may take

15  nothing of Cobalis because of its usury, breach of contract, breach of the implied covenant under

16  New Jersey law of good faith a fair dealing; violation of the automatic stay.

17      Montenegrex respectfully seeks such other and further relief as to this Court seems just.

18  August 16, 2011

19                                              Montenegrex

20                                              Unsecured creditor

21

22                                              /s/

23

24                                              By Rey Olsen, *in propria persona*

25                                              P. O. Box 7022

26                                              New York, NY 10150-7022

27                                              917 701-1101

28                                              WSGNY@AOL.COM

29

30